[Cite as *Hall v. Bricker*, 2024-Ohio-1339.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Gregory B. Hall, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 23AP-140 |
| v. | : | (C.P.C. No. 18DR-3471) |
| Monica L. Bricker, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on April 9, 2024

**On brief:** *Dougherty, Hanneman & Piccin, LLC*, and *Douglas B. Dougherty* for appellant. **Argued:** *Douglas B. Dougherty*.

**On brief:** *Wolinetz, Horvath & Brown, LLC, Dennis E. Horvath*, and *Eric M. Brown* for appellee. **Argued:** *Dennis E. Horvath*.

APPEAL from the Franklin County Court of Common Pleas, Division of Domestic Relations

EDELSTEIN, J.

{¶ 1} Plaintiff-appellant, Gregory B. Hall, appeals from the January 30, 2023 judgment entry and final divorce decree of the Franklin County Court of Common Pleas, Division of Domestic Relations. On appeal, Mr. Hall takes issue with the trial court's valuation and award of marital retirement assets, stock, and stock options held in defendant-appellee, Monica L. Bricker's, name. In addition, Mr. Hall contends the trial court failed to equitably divide the parties' joint home equity line of credit and erred in ordering that he reimburse Ms. Bricker for the monthly payments she made towards that debt.

{¶ 2}   For the following reasons, we reverse the trial court's judgment, in part, and remand the case for further proceedings consistent with this decision.

## I.   PROCEDURAL OVERVIEW

{¶ 3}   Mr. Hall and Ms. Bricker were married in 1989.  During their marriage of nearly three decades, the parties accumulated significant assets and considerable debts.  In 2018, Mr. Hall filed a complaint for divorce, and Ms. Bricker counterclaimed, also seeking a divorce.  Although many contested matters arose during the pendency of litigation in the court below, most are not relevant to our determination of the issues before us.  Suffice it to say the divorce proceedings were heavily litigated and not particularly amicable.

{¶ 4}   The trial court held a four-day divorce trial in August/September 2022.  As part of that trial, the parties filed joint stipulations on September 8, 2022, which were accepted by the trial court and admitted into the record.  Notably, prior to trial, the trial court found that the parties' marriage commenced on the ceremonial date of October 21, 1989 and ended on October 9, 2017, the de facto marriage termination date determined by the trial court.  (*See* Oct. 8, 2021 Entry; Jan. 30, 2023 Divorce Decree at 3.)

{¶ 5}   At trial, both parties testified extensively about their various assets and debts.  They also presented considerable evidentiary support in the form of both documents and testimony from other witnesses.  At the center of this appeal are the marital retirement accounts owned by Ms. Bricker and valued, in total, at $579,423 (Divorce Decree at 6); the parties' home equity line of credit ("HELOC") debt, with a balance of $105,223 as of December 5, 2017 (Divorce Decree at 5); and the 55 options for Iceland Milk and SKYR Corporation ("Siggi's") stock acquired, exercised, and/or sold by Ms. Bricker for a total net deposit of $477,745.95 into her money market account (Divorce Decree at 11).

{¶ 6}   After the trial concluded, the parties submitted written closing arguments and proposed decrees of divorce.  On January 30, 2023, the trial court issued a decision with findings of fact and conclusions of law on the various issues contested by the parties.  In relevant part, the trial court valued Ms. Bricker's vested but unmatured Revlon pension at $1 (first assignment of error); awarded Ms. Bricker's retirement accounts to her, alone, on account of Mr. Hall's financial misconduct and/or equity (second assignment of error); found Mr. Hall solely responsible for the balance owed on the HELOC debt, including the $22,330.86 paid by Ms. Bricker after Mr. Hall stopped making payments (third assignment

of error); and awarded Mr. Hall $36,052.50 after calculating the marital value of Ms. Bricker's Siggi's stock and stock options on the de facto termination date using the stock option agreement's exercise price ($1,311 per share) instead of the actual proceeds Ms. Bricker received from the sale in February 2018 (fourth assignment of error).

{¶ 7}   Mr. Hall timely appealed from the trial court's January 30, 2023 judgment and asserts four assignments of error for our review:

> [I.] THE TRIAL COURT ERRED WHEN IT FAILED TO PROPERLY VALUE [MS. BRICKER'S] REVLON RETIREMENT PLAN[.]
>
> [II.] THE TRIAL COURT ERRED WHEN IT AWARDED [MS. BRICKER] 100% OF THE PARTIES' MARITAL RETIREMENT ASSETS HELD IN [MS. BRICKER'S] NAME[.]
>
> [III.] THE TRIAL COURT ERRED WHEN IT: FIRST, ORDERED [MR. HALL] TO PAY 100% OF THE BALANCE OWED ON THE PARTIES' JOINT HOME EQUITY LINE OF CREDIT (HELOC) DEBT; AND SECOND, ORDER[ED] [MR. HALL] TO REIMBURSE [MS. BRICKER] FOR 100% OF THE MONTHLY PAYMENTS MADE BY [MS. BRICKER] ON THE HELOC DEBT[.]
>
> [IV.] THE TRIAL COURT DID NOT PROPERLY VALUE OR DIVIDE THE PARTIES' MARITAL STOCK AND STOCK OPTIONS[.]

## II. FACTS

{¶ 8}   Mr. Hall and Ms. Bricker both graduated with bachelor's degrees from The Ohio State University (Aug. 30, 2022 Tr. Vol. II at 271) and are the same age. (Aug. 29, 2022 Tr. Vol. I at 36-37). Before they wed in 1989, the parties lived together for several years in Detroit and Chicago. (*See* Tr. Vol. II at 271-72; Aug. 31, 2022 Tr. Vol. III at 534-35, 565-70; Sept. 7, 2022 Tr. Vol. IV at 600, 709-11, 752-55.) Ultimately, they returned to Columbus in the early 1990s (*see* Tr. Vol. I at 48-51; Tr. Vol. III at 569-70; Tr. Vol. IV at 709-10, 755-57) and purchased the marital residence on Upper Chelsea Road in 1996 (Ex. J1; Tr. Vol. IV at 601), which was subject to the divorce proceedings in this case.

{¶ 9}   Prior to and in the early years of their marriage, Mr. Hall worked for different video wholesale and distribution companies. (*See* Tr. Vol. I at 48-52; Tr. Vol. II at 272-74; Tr. Vol. III at 532-35, 565-70; Tr. Vol. IV at 709-10, 752-57.) Both parties described their income during this time frame as approximately equal. (*See* Tr. Vol. I at 56-57; Ex. G2; Ex. 66; Tr. Vol. III at 531-34; Tr. Vol. IV at 679, 708-11.)

{¶ 10} In 1999, Mr. Hall opened Media Distributors, Inc. ("Media Distributors"), a VHS tape resale business that bought closeout inventory and resold it through an online platform like eBay, which was relatively new at that time. (Tr. Vol. I at 51-52; Tr. Vol. II at 283-84; Tr. Vol. III at 535-36. *See* Tr. Vol. IV at 710-11.) While Ms. Bricker recalled having concerns about Mr. Hall leaving his stable corporate job, she acknowledged that "as a married couple, that was the decision we made." (Tr. Vol. IV at 711. *See also* Tr. Vol. IV at 753-54.) More pointedly, Ms. Bricker testified she was supportive of Mr. Hall's decision. (Tr. Vol. IV at 754.)

{¶ 11} Over time, however, the aggressive market shift from VHS tapes to DVDs (and later, streaming) devalued Media Distributors's inventory. (*See, e.g.*, Tr. Vol. I at 51-52; Tr. Vol. II at 284.)

{¶ 12} Although Mr. Hall reported no earnings in 2001, 2002, and 2003 (Ex. G2; Tr. Vol. III at 479-80), Ms. Bricker left her career in the fall of 2003 so she could stay home with the parties' three children—all minors at the time but adults at the time of the divorce (*see* Tr. Vol. IV at 600-01, 708)—and focus on projects at home. (Tr. Vol. I at 54-56; Tr. Vol. II at 295-96; Tr. Vol. IV at 682, 708-09, 759-61; Ex. 66. *See also* Ex. KK1.) Thus, between fall 2003 and fall 2007, Mr. Hall was the only income earner for the family. (Tr. Vol. IV at 708-09, 760-61; Ex. 66; Ex. G2.)

{¶ 13} Evidence showed that, between January 2003 and October 2004, Mr. Hall received $224,885 in disbursements from his retirement accounts and invested those funds into Media Distributors. (Divorce Decree at 9; Ex. GG. *See* Tr. Vol. III at 475-76, 523-30.) Specifically, the trial court found Mr. Hall received a $24,000 disbursement check on January 31, 2003; a $115,000 disbursement check on February 18, 2004; a $50,000 bank wire transfer on July 28, 2004; and a $35,885 bank wire transfer on October 5, 2004. (Divorce Decree at 9, citing Ex. GG. *See also* Tr. Vol. III at 524-27.)

{¶ 14} At trial, Ms. Bricker testified that she first learned about Mr. Hall's investment of retirement funds into his business in April 2004 when he asked—***and she agreed***—to refinance and open a HELOC on their marital residence. (Tr. Vol. IV at 606-12, 659-61. *See* Ex. BB1.) Mr. Hall, however, maintained that Ms. Bricker knew he intended to liquidate all of his retirement accounts for investment in Media Distributors. (*See* Tr. Vol. III at 522-30, 570-71.) On review, evidence in the record shows that an application for

mortgage refinancing was first made on March 16, 2004. (Ex. BB1, "Mortgage Broker Checklist." *See also* Ex. BB1, "First American Title Insurance Company: Schedule A.")

**{¶ 15}** In any event, it is undisputed that, on or around April 19, 2004, ***both parties*** signed the paperwork necessary to refinance their marital residence and open the HELOC. (*See* Ex. BB1; Tr. Vol. III at 463-68; Tr. Vol. IV at 608-09, 729.) It is also undisputed the HELOC was secured to help finance Mr. Hall's business. (*See, e.*g., Tr. Vol. III at 463-74; Tr. Vol. IV at 606-12.)

**{¶ 16}** Under their HELOC agreement with Fifth Third Bank, the parties received a line of credit in the amount of $105,000 secured by a deed of trust on their marital home. (*See* Ex. BB1.) As of December 5, 2017, the parties owed $105,223 on the HELOC debt. (Divorce Decree at 5. *See* Ex. J3.) Ms. Bricker testified she "refused to pay" any of the HELOC payments because that debt was incurred and invested into Mr. Hall's now-defunct business. (*See, e.g.*, Tr. Vol. IV at 607, 610-12, 728-31.) Evidence showed that all HELOC payments were made through Mr. Hall's business accounts up until Mr. Hall moved out of the marital home in 2017. (Tr. Vol. III at 469-74; Tr. Vol. IV at 607, 610-12; Ex. BB2.)

**{¶ 17}** Mr. Hall received additional disbursements from his retirement accounts in July 2004 and October 2004. (*See* Ex. GG.) He testified he was never able to repay any funds back into those retirement accounts, and no evidence presented at trial showed that he ever did. (Tr. Vol. III at 525. *See also* Tr. Vol. IV at 660-61.) Although Ms. Bricker suggested Mr. Hall may have received additional disbursements from his retirement accounts after 2004 (*see* Tr. Vol. IV at 660-61, 709), no evidence documenting as much was presented at trial to support that claim.[1]

**{¶ 18}** Ms. Bricker recounted realizing "by 2006" that Mr. Hall's business would not be able to support their family. (Tr. Vol. IV at 711. *See also* Tr. Vol. IV at 675-80.) But she claimed her concerns "really hit the wall by 2007," as evidenced by emails between the parties from that time frame. (Tr. Vol. IV at 711-19; Ex. KK1.) One email showed that after Mr. Hall told Ms. Bricker in May 2007 he was not earning enough to sustain the parties'

---

[1] On review, it appears Ms. Bricker's testimony about additional accounts liquidated between 2005 and 2007 (*see* Tr. Vol. IV at 660-61) actually pertained to their children's college funds, not Mr. Hall's retirement accounts. (*See* Tr. Vol. IV at 664-65, 709, 723-24.) But, after acknowledging this issue was something their children needed to address with Mr. Hall and indicating she did not want to get in the middle of it, Ms. Bricker ultimately removed the college accounts from her balance sheet (Tr. Vol. IV at 795-96) and the trial court thus made no findings related thereto.

household, Ms. Bricker asked Mr. Hall to close Media Distributors and liquidate its assets. (Ex. KK1. *See also* Tr. Vol. I at 55-56; Tr. Vol. II at 295-96; Tr. Vol. III at 476-77, 486-88; Tr. Vol. IV at 675-82, 711-12, 768-71.) Although Ms. Bricker acknowledged that Mr. Hall "asked for [her] support in trying to work through inventory" in 2007, she testified she was "busy with [their] three children" and believed Mr. Hall needed to hire a third-party liquidation company because that was not her area of expertise. (*See* Tr. Vol. IV at 768-71.)

{¶ 19} Ms. Bricker returned to work in the fall of 2007. (*See* Tr. Vol. I at 55-58; Tr. Vol. III at 476-77; Tr. Vol. IV at 682, 759-61; Ex. 66; Ex. G2.) However, Mr. Hall continued operating Media Distributors until 2014—long after it was no longer profitable. (*See* Tr. Vol. I at 52; Tr. Vol. III at 477; Tr. Vol. IV at 678-82, 711-12; Ex. G2.) He did so with the HELOC funds, maxing out credit cards, paying himself a meager income, and receiving personal loans from his father and sister. (*See, e.g.*, Tr. Vol. II at 222-23, 287-95; Tr. Vol. IV at 693-95; Ex. 97; Ex. 98; Ex. 127.) Mr. Hall testified that he continued operating Media Distributors with the aim of settling its debts and slowly winding down operations. (*See* Tr. Vol. I at 52; Tr. Vol. III at 485. *See also* Tr. Vol. IV at 679.) But the business ultimately failed and closed by 2014 with considerable outstanding debts remaining even at the time of the parties' 2022 divorce trial. (*See* Tr. Vol. I at 52-53, 91; Tr. Vol. II at 222-23, 287-95; Tr. Vol. III at 483-84; Ex. BB4.)

{¶ 20} In stark contrast, Ms. Bricker maintained a stable and lucrative employment, acquiring various retirement assets and benefits in connection therewith, throughout the pendency of the parties' marriage. (*See, e.g.*, Tr. Vol. I at 37-42; Tr. Vol. III at 559, Tr. Vol. IV at 617, 630-45, 658-59, 679. *See generally* Divorce Decree at 6.) On the de facto termination date of the parties' marriage, October 9, 2017, Ms. Bricker owned several defined contribution retirement accounts, which the trial court found had a total cash value of $579,423. (*See* Divorce Decree at 6.) She also had a vested pension from Revlon with a monthly benefit of $1,877 when it matures on July 1, 2026. (Ex. 35. *Compare* Divorce Decree at 6.) In contrast, Mr. Hall had no marital retirement accounts subject to division and allocation between the parties. (*See* Divorce Decree at 6; Tr. Vol. II at 263.) Also significant were the Siggi's stock and stock options Ms. Bricker received pursuant to the incentive stock option agreement with her employer in 2016. (Ex. CC1.) The trial court

determined Ms. Bricker received a net deposit of $477,745.95 after all 55 shares of her Siggi's stock sold in February 2018. (Divorce Decree at 11; Ex. CC1; Ex. CC.)

{¶ 21} Before turning to the merits of Mr. Hall's four assignments of error, we note as an initial matter that the trial court found Ms. Bricker's testimony "to be far more credible" than Mr. Hall's because her "recollection of events was clearer[] and her assertions better supported by the record." (Divorce Decree at 3.)

## III. LEGAL STANDARDS

### A. Valuation and Division of Assets

{¶ 22} In divorce proceedings, the trial court is required to determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B). Upon making such determinations, the trial court must divide the marital and separate property equitably, between the spouses, in accordance with R.C. 3105.171. *Id.*

{¶ 23} R.C. 3105.171(D) requires disbursement of a spouse's separate property to that spouse. However, this general rule is subject to an exception for distributive awards issued under R.C. 3105.171(E). A "distributive award" means a payment in real or personal property made from the separate property of a spouse that is not a payment of spousal support. R.C. 3105.171(A)(1).

{¶ 24} R.C. 3105.171(C)(1) generally provides that marital property shall be divided equally, unless an equal division would be inequitable, in which case the property shall be divided in the manner the trial court determines equitable. Determining what is equitable requires a consideration of the factors listed in R.C. 3105.171(F). *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, ¶ 5. A trial court must evaluate all relevant facts in determining an equitable division. *Caleshu v. Caleshu*, 10th Dist. No. 19AP-742, 2020-Ohio-4075, ¶ 8, citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 355 (1981). Although a trial court has broad discretion in determining property division, an equal distribution should be the starting point of the analysis. *Goebel v. Goebel*, 10th Dist. No. 15AP-61, 2015-Ohio-5547, ¶ 7, citing *Cherry* at 353.

{¶ 25} To determine an appropriate division, the trial court must value the marital property. *See Raymond v. Raymond*, 10th Dist. No. 11AP-363, 2011-Ohio-6173, ¶ 22. "R.C. 3105.171 expresses no specific way for the trial court to determine valuation." *Banchefsky v. Banchefsky*, 10th Dist. No. 09AP-1011, 2010-Ohio-4267, ¶ 43, citing *Focke v. Focke*, 83

Ohio App.3d 552, 554 (2d Dist.1992). Furthermore, " 'Ohio courts have not specified that only one method of valuation is appropriate when dividing marital property.' " *Kuper v. Halbach*, 10th Dist. No. 09AP-899, 2010-Ohio-3020, ¶ 12, quoting *Herrmann v. Herrmann*, 12th Dist. No. CA99-01-006, 2000 Ohio App. LEXIS 5146, *14 (Nov. 6, 2000). Accordingly, "[w]hen determining the value of marital assets, a trial court is not confined to the use of a particular valuation method, but can make its own determination as to valuation based on the evidence presented." *Day v. Day*, 10th Dist. No. 08AP-440, 2009-Ohio-638, ¶ 10, citing *James v. James*, 101 Ohio App.3d 668, 681 (2d Dist.1995). *See also Smoyer v. Smoyer*, 10th Dist. No. 18AP-365, 2019-Ohio-3461, ¶ 40.

{¶ 26} It is well-established, then, that a trial court generally has broad discretion to develop some measure of value. *See, e.g.*, *Berish v. Berish*, 69 Ohio St.2d 318 (1982); *Sangeri v. Yerra*, 10th Dist. No. 19AP-675, 2020-Ohio-5520, ¶ 25. Thus, the "valuation of marital assets is typically a factual issue that is left to the discretion of the trial court." *Roberts v. Roberts*, 10th Dist. No. 08AP-27, 2008-Ohio-6121, ¶ 18, citing *Berish* at 319. *See also Raymond* at ¶ 22; *Day* at ¶ 11. " 'Although a trial court enjoys broad discretion in determining the value of a marital asset, such discretion is not without limit.' " *Fernando v. Fernando*, 10th Dist. No. 16AP-788, 2017-Ohio-9323, ¶ 26, quoting *Apps v. Apps*, 10th Dist. No. 02AP-1072, 2003-Ohio-7154, ¶ 38. "A trial court's assignment of an asset's value must be based upon competent, credible evidence," meaning "evidence that is both competent, credible evidence of value and a rational basis upon which to establish the value." *Warren v. Warren*, 10th Dist. No. 09AP-101, 2009-Ohio-6567, ¶ 15. That is to say, "[a] trial court must have a rational evidentiary basis for assigning value to marital property." *Fernando* at ¶ 26. *See also Dach v. Homewood*, 10th Dist. No. 14AP-502, 2015-Ohio-4191, ¶ 36.

## B. Standard of Review

{¶ 27} " 'An appellate court's duty is not to require the adoption of any particular method of valuation, but to determine whether, based upon all the relevant facts and circumstances, the court abused its discretion in arriving at a value.' " *Fernando* at ¶ 26, quoting *Apps* at ¶ 38. Because this court is not a trier of fact, our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base his or her judgment. *See, e.g.*, *Miller v. Miller*, 10th Dist. No. 18AP-877, 2021-

Ohio-4573, ¶ 15; *Tennant v. Martin-Auer*, 188 Ohio App.3d 768, 2010-Ohio-3489, ¶ 16 (5th Dist.); *Banchefsky* at ¶ 43, quoting *Moro v. Moro*, 68 Ohio App.3d 630, 637 (8th Dist.1990). Thus, we generally review the overall appropriateness of a trial court's determination of marital property division in divorce proceedings under an abuse of discretion standard. *See, e.g.*, *Teeter v. Teeter*, 18 Ohio St.3d 76 (1985), citing *Cherry* at 355.

{¶ 28} "[A]buse of discretion connotes that the court's attitude is unreasonable, arbitrary or unconscionable." (Internal quotations omitted.) *State v. Weaver*, 171 Ohio St.3d 429, 2022-Ohio-4371, ¶ 24, quoting *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 60, quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "A decision is unreasonable if there is no sound reasoning process that would support the decision." (Internal quotations omitted.) *Fernando* at ¶ 7, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). A decision is arbitrary if it is made "without consideration of or regard for facts [or] circumstances." (Internal quotations omitted.) *State v. Hill*, 171 Ohio St.3d 524, 2022-Ohio-4544, ¶ 9, quoting *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed.2014). A decision may also be arbitrary if it lacks any adequate determining principle and is not governed by any fixed rules or standards. *See Beasley* at ¶ 12, citing *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359 (1981), citing *Black's Law Dictionary* 96 (5th Ed.1979). *See also State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, ¶ 19. A decision is unconscionable if it "affronts the sense of justice, decency, or reasonableness." *Fernando* at ¶ 7, citing *Porter, Wright, Morris & Arthur, LLP v. Frutta Del Mondo, Ltd.*, 10th Dist. No. 08AP-69, 2008-Ohio-3567, ¶ 11.

{¶ 29} An abuse of discretion may also be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶ 15 (8th Dist.). *See also New Asian Super Mkt. v. Jiahe Weng*, 10th Dist. No. 17AP-207, 2018-Ohio-1248, ¶ 16.

## IV. ANALYSIS

{¶ 30} Mr. Hall's first and second assignments of error concern Ms. Bricker's retirement accounts and are interrelated and thus are addressed together. We then analyze Mr. Hall's third and fourth assignments of error in the order they are presented.

### A. First and Second Assignments of Error

{¶ 31} Evidence presented at trial established a great disparity between the valuation of the parties' retirement accounts at the time of the parties' divorce, with Ms. Bricker's valued at $579,423 (all marital assets subject to division) and Mr. Hall's valued at $1,736 (a separate asset not subject to division). (*See* Divorce Decree at 6.) At trial—and now, on appeal—Mr. Hall requested the retirement accounts be equalized, while Ms. Bricker argued they should be allocated to the party who owned them as of October 9, 2017, the date of the de facto termination of marriage. Ms. Bricker posited that this unequal distribution of assets is equitable under R.C. 3105.171(E)(4) because Mr. Hall's management of the marital retirement accounts held in his name constituted financial misconduct. (*See, e.g.*, Tr. Vol. IV at 720-21, 748.)

{¶ 32} The trial court agreed with Ms. Bricker and found she was "entitled, due to both financial misconduct and/or equitable grounds, to a distributive award granting her all of her remaining retirement accounts in their entirety." (*See* Divorce Decree at 7-10.) Noting that Ms. Bricker's retirement accounts "represent 69.63% of the parties['] net marital assets," the trial court found that an equalization payment of $376,275 would undercut its finding that Ms. Bricker's retirement accounts "are the subject of a distributive award due to [Mr. Hall's] financial misconduct and/or equitable considerations" and "the equity of this decree." (Divorce Decree at 29.) In his **first assignment of error**, Mr. Hall contends the trial court erred and abused its discretion when it found financial misconduct and/or equity entitled Ms. Bricker to a distributive award granting her all of the retirement accounts held in her name in their entirety. (*See* Brief of Appellant at 13-43; Divorce Decree at 7-10.)

{¶ 33} Notably, the trial court's equitable determinations relied on its valuation of the marital retirement assets held in Ms. Bricker's name at $579,423. (*See* Divorce Decree at 6, 29.) Included in this calculation was the trial court's determination that Ms. Bricker's unmatured Revlon pension—which vested during the parties' marriage—had a present cash

value of $1. (Divorce Decree at 6.) In his **second assignment of error**, Mr. Hall argues the trial court's failure to properly value the Revlon pension was an abuse of discretion. (Brief of Appellant at 11-12; Divorce Decree at 6.) Specifically, he contends the trial court erred by (1) finding that he "engaged in financial misconduct" (Brief of Appellant at 15-27); (2) finding that "an equal division of the remaining marital retirement assets would be inequitable" (Brief of Appellant at 28-38); and (3) awarding "100% of the remaining marital retirement assets to [Ms. Bricker]" (Brief of Appellant at 39-43).

{¶ 34} Because we review a trial court's division of property for an abuse of discretion, our job " 'is not to reweigh the evidence but to determine whether competent, credible evidence in the record supports the trial court's findings.' " *Caleshu*, 2020-Ohio-4075 at ¶ 9, quoting *Hood v. Hood*, 10th Dist. No. 10AP-999, 2011-Ohio-3704, ¶ 14, citing *Dunham v. Dunham*, 171 Ohio App.3d 147, 2007-Ohio-1167, ¶ 27 (10th Dist.), and *Taub v. Taub*, 10th Dist. No. 08AP-750, 2009-Ohio-2762, ¶ 15. " 'The mere fact that a property division is unequal, does not, standing alone, amount to an abuse of discretion.' " *Martin v. Martin*, 18 Ohio St.3d 292, 294 (1985), quoting *Cherry*, 66 Ohio St.2d at paragraph two of the syllabus.

### 1. Distributive Award

{¶ 35} We begin our analysis by first addressing the propriety of the trial court's decision to unequally divide marital retirement assets as a mechanism for effectuating a distributive award made under R.C. 3105.171(E).

{¶ 36} Distributive awards may be made for several reasons. Relatedly, here, a distributive award is proper "[i]f a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets." R.C. 3105.171(E)(4). A domestic relations court may also "make a distributive award in lieu of a division of marital property in order to achieve equity between the spouses, if the court determines that a division of the marital property in kind or in money would be impractical or burdensome." R.C. 3105.171(E)(2). And, more broadly, a distributive award can be made "to facilitate, effectuate, or supplement a division of marital property." R.C. 3105.171(E)(1). When making a distributive award, the court is required to "make written findings of fact that support the determination that the marital property has been equitably divided." R.C. 3105.171(G).

{¶ 37} Significantly, a "distributive award" is "any payment or payments, in real or personal property, that are payable in a lump sum or over time, in fixed amounts, that are *made from separate property or income*, and *that are not made from marital property* and do not constitute payments of spousal support, as defined in section 3105.18 of the Revised Code." (Emphasis added.)  R.C. 3105.171(A)(1).

{¶ 38} In this case, the trial court found Ms. Bricker's retirement accounts were marital assets subject to division and allocation between the parties.  (Divorce Decree at 10.)  It also found that Mr. Hall's financial misconduct and equity entitled Ms. Bricker to "a *distributive award* granting her all of her remaining retirement accounts in their entirety."  (Emphasis added.)  (Divorce Decree at 10. *See also* Divorce Decree at 8-9.)

{¶ 39} R.C. 3105.171(A) plainly states that distributive awards "are not made from marital property."  Thus, the trial court's distributive award from marital property was contrary to law.

{¶ 40} It is true that R.C. 3105.171(E)(4) also permits a trial court to make "a greater award of marital property" to one spouse when it finds the other spouse has engaged in financial misconduct.  And it is true that R.C. 3105.171(C)(1) authorizes a trial court to divide marital property unequally between the spouses if, after considering all relevant factors, including those delineated in R.C. 3105.171(F), it determines that an equal division of marital property would be inequitable.

{¶ 41} But we cannot ignore the trial court's plain and repeated statement that Ms. Bricker's entitlement to a distributive award formed the basis for its decision not to divide— equally or otherwise—the marital retirement accounts held in Ms. Bricker's name.  (*See* Divorce Decree at 7-10.)  After all, it is a mainstay of Ohio jurisprudence that a court speaks only through its journal entries.  *See, e.g.*, *State v. Powers*, 10th Dist. No. 15AP-422, 2015-Ohio-5124, ¶ 18; *State ex rel. Worcester v. Donnellon*, 49 Ohio St.3d 117, 118 (1990).  Were it to appear that a single reference to a distributive award in this context amounted to scrivener's error, our analysis here might well be different.  However, the trial court makes abundantly clear its intention to make a distributive award to Ms. Bricker from marital assets by declining to divide them.

{¶ 42} To be sure, the trial court stated its finding that Ms. Bricker was entitled to a "distributive award" three times in the relevant section of its analysis.  (*See* Divorce Decree

at 8-10.) It also discussed and heavily relied upon our analysis in *Parker v. Parker*, 10th Dist. No. 05AP-1171, 2006-Ohio-4110—a case concerning a ***distributive award***, not a greater award of marital property, to wife based on husband's financial misconduct—as legal support for its distributive award finding in this case. (*See* Divorce Decree at 7-10.) Moreover, in finding that an equalization payment of $376,275 would be inequitable in this case, the trial court stated the following:

> The primary assets driving the difference in distribution are [Ms. Bricker's] retirement accounts which represent 69.63% of the parties['] net marital assets. ***But as the Court noted in Section II(B)(8), these retirement accounts are the subject of a distributive award due to [Mr. Hall's] financial misconduct and/or equitable considerations.*** To then order an equalization payment would undercut those findings by the Court as well as the equity of this decree.
>
> In the interest of fairness and equity, the Court therefore declines to order an equalization payment in this case.

(Emphasis added.) (Divorce Decree at 29.)

**{¶ 43}** Based on the foregoing, we conclude the trial court acted contrary to law when it made a distributive award under R.C. 3105.171(E)(4) (financial misconduct) and/or R.C. 3105.171(E)(2) (equity) from the marital retirement assets held in Ms. Bricker's name. This determination is not dispositive, however, to our analysis of all issues presented in Mr. Hall's first and second assignments of error.

## 2. Financial Misconduct

**{¶ 44}** In his second assignment of error, Mr. Hall argues that the trial court's division of the marital retirement assets held in Ms. Bricker's—100 percent to Ms. Bricker and 0 percent to Mr. Hall—was unreasonable or arbitrary due to the lack of sufficient evidence of financial misconduct. (Brief of Appellant at 15-27.) While the trial court erroneously stated that Mr. Hall's financial misconduct under R.C. 3105.171(E)(4) was the statutory basis for making the ***distributive award***—which, as explained above, could not be made from marital assets—that provision also permits a trial court to "compensate the offended spouse * * * with a greater award of marital property" if it finds "a spouse has engaged in financial misconduct." *See* R.C. 3105.171(E)(4). Because the trial court found Mr. Hall engaged in financial misconduct and awarded Ms. Bricker all of the marital

retirement accounts held in her name based on that finding, we conclude that the propriety of the trial court's financial misconduct finding is properly before this court.

### a. Legal Standards

{¶ 45} The term "financial misconduct" has a specific meaning and is defined in R.C. 3105.171(E)(4). Pursuant to that provision, financial misconduct includes, but is not limited to "the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets." R.C. 3105.171(E)(4). Financial misconduct necessarily implicates some type of knowing wrongdoing, such as one spouse's intentional interference with the other spouse's property rights or the offending spouse's profiteering from the misconduct. *See, e.g., Kowalkowski-Tippett v. Tippett*, 10th Dist. No. 20AP-228, 2021-Ohio-4220, ¶ 15, quoting *Chawla v. Chawla*, 10th Dist. No. 13AP-399, 2014-Ohio-1188, ¶ 35, citing *Taub*, 2009-Ohio-2762 at ¶ 33, *Heller v. Heller*, 10th Dist. No. 07AP-871, 2008-Ohio-3296, ¶ 27, and *Hamad v. Hamad*, 10th Dist. No. 06AP-516, 2007-Ohio-2239, ¶ 62. Thus, "[f]inancial misconduct requires more than dishonest behavior." *Bucalo v. Bucalo*, 9th Dist. No. 05CA0011-M, 2005-Ohio-6319, ¶ 30. It also requires some element of wrongful intent or scienter. *See, e.g., Mantle v. Sterry*, 10th Dist. No. 02AP-286, 2003-Ohio-6058, ¶ 32; *Young v. Young*, 9th Dist. No. 19CA011573, 2022-Ohio-2535, ¶ 6. As such, the mere dissipation of assets does not automatically signify financial misconduct for the purposes of R.C. 3105.171(E)(4). *See, e.g., Lunger v. Lunger*, 7th Dist. No. 16 CO 0026, 2017-Ohio-9008, ¶ 21.

{¶ 46} Courts have long recognized that the timing of the alleged misconduct may demonstrate wrongful scienter. *See, e.g., Hammond v. Brown*, 8th Dist. No. 67268, 1995 Ohio App. LEXIS 3975, *9-10 (Sept. 14, 1995) (summarizing cases where diminution of the marital estate occurs during parties' separation or while divorce action pending); *Mikhail v. Mikhail*, 6th Dist. No. L-03-1195, 2005-Ohio-322, ¶ 29-30 (the same). *See also Hoffman v. Hoffman*, 10th Dist. No. 94APF01-48, 1994 Ohio App. LEXIS 3536 (Aug. 11, 1994) (during the latter part of the marriage, husband invested more than $44,000 in marital funds in his girlfriend's business and failed to obtain any written documentation to evidence his contribution or role in the business); *Detlef v. Detlef*, 6th Dist. No. L-00-1137, 2001 Ohio App. LEXIS 5597 (Dec. 14, 2001) (affirming financial misconduct finding where husband began withholding cash deposits from his business account and instead made

large cash deposits to his personal account after his wife filed for divorce). In other words, "[w]rongful scienter may be established based on when the alleged financial misconduct occurred in relation to the filing and pendency of the divorce or period of separation." *Young* at ¶ 6, citing *Downey v. Downey*, 9th Dist. No. 23687, 2007-Ohio-6294, ¶ 17.

{¶ 47} "[I]f the time frame of the alleged misconduct does not establish [wrongful] scienter, there must be some other evidence that does establish it." *Orwick v. Orwick*, 7th Dist. No. 04 JE 14, 2005-Ohio-5055, ¶ 28. The burden of proving financial misconduct rests with the complaining spouse. *See Kowalkowski-Tippett* at ¶ 15.

{¶ 48} We will not reverse a trial court's determination regarding financial misconduct unless it is against the manifest weight of the evidence. *Kowalkowski-Tippett* at ¶ 16, citing *Best v. Best*, 10th Dist. No. 11AP-239, 2011-Ohio-6668, ¶ 18. Under this standard, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). *See also Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

### b. Analysis

{¶ 49} In the present case, Mr. Hall liquidated his retirement accounts between January 2003 and October 2004 and invested those funds into Media Distributors to "move [the] business forward." (Tr. Vol. III at 475, 522-30.) The evidence showed that Media Distributors continued to operate and began generating income after 2004—when Mr. Hall's retirement accounts were liquidated and the HELOC was obtained. (*See* Ex. G2; Tr. Vol. III at 479-80.) It was not until 2012 that Mr. Hall reported earning zero in income, which continued up until Media Distributors closed in 2014 or 2015. (*See* Tr. Vol. I at 52; Ex. G2.) Though there is still some associated debt with his now-defunct business, there is no evidence to suggest Mr. Hall engaged in any purposeful wrongdoing with respect to the operation of his business.

{¶ 50} Unfortunately, that business failed once its retail goods—VHS tapes—were no longer in demand. In her closing brief following trial, Ms. Bricker alleged Mr. Hall "engaged in financial misconduct due to his ***fraudulent*** dissipation of his retirement accounts" but did not explain precisely what conduct Ms. Bricker believed rose to the level

of fraud. (Emphasis added.) (Oct. 7, 2022 Def.'s Closing Brief at 7. *Compare* Tr. Vol. IV at 721.) Although Ms. Bricker disagreed with Mr. Hall's decision to continue operating the business after 2007 and believed he acquired far too much inventory (*see* Ex. KK1), there is no evidence to suggest that Mr. Hall committed fraud or otherwise acted ***unlawfully*** when he liquidated his retirement accounts and invested those funds into his Media Distributors business. Indeed, Ms. Bricker acknowledged the retirement accounts at issue were in Mr. Hall's name only, meaning she was not legally required to sign anything for Mr. Hall to receive disbursements therefrom. (*See* Tr. Vol. IV at 659-60.) Essentially, then, it was Ms. Bricker's position that Mr. Hall's decision to invest his retirement funds into a business that ultimately failed because of its outmoded inventory constituted financial misconduct. (*See* Tr. Vol. IV at 721.)

{¶ 51} A review of Ohio appellate case law reveals that unsuccessful marital investments and allegations of financial misconduct often go hand in hand. Courts have addressed the issue of financial misconduct related to erratic stock trading, poor investments, and the failure to maintain business insurance, and concluded that making bad business or investment decisions does not, alone, rise to the level of financial misconduct contemplated by R.C. 3105.171(E)(4). *See, e.g.*, *Jacobs v. Jacobs*, 4th Dist. No. 02CA2846, 2003-Ohio-3466, ¶ 23 (holding that "investing, even poor investing, is neither wrongdoing nor financial misconduct and [declining to] construe the statute so broadly as to include investment mistakes"); *Bucalo*, 2005-Ohio-6319 at ¶ 30 (noting that "[f]inancial misconduct requires more than dishonest behavior" and finding that husband's failure to heed wife's investing requests—although "clearly irresponsible" and "bordering on dishonesty"—did not rise to the level of financial misconduct); *Smith v. Smith*, 12th Dist. No. CA2016-08-059, 2017-Ohio-7463, ¶ 11-20 (reversing trial court's finding that husband committed financial misconduct by allowing liability insurance on his pallet company's building to lapse, which resulted in a "valuable marital asset" being lost through a fire and requiring husband to secure a significant line of credit in order to continue operations); *Tate v. Tate*, 5th Dist. No. 17CA004, 2018-Ohio-1244 (finding trial court's decision on financial misconduct against the manifest weight of the evidence where there was no evidence investment losses—withdrawing $146,000 from parties' joint bank accounts and investing the money in the stock market at a loss—were incurred purposely or to

intentionally dissipate wife's share of the marital estate); *Mikhail*, 2005-Ohio-322 at ¶ 31-32 (declining to find financial misconduct for "risky investments").

{¶ 52} In this case, the trial court found that "[w]hatever the merits of [Mr. Hall's] strategy to take his retirement funds [in 2003 and 2004] and put [them] into his business, to not inform [Ms. Bricker] of that act is deceptive." (Divorce Decree at 8.) The trial court also recognized that Mr. Hall "was by no means compelled to leave those sums in his retirement account." (Divorce Decree at 10.) In other words, the lawful liquidation of retirement accounts held in Mr. Hall's name did not, in and of itself, satisfy the scienter or wrongdoing requirements for establishing financial misconduct. Rather, the trial court found that Mr. Hall's actions rose to the level of financial misconduct because (1) he used his liquidated retirement account funds "for a non-marital purpose"—investment in his business, and he did so (2) without Ms. Bricker's knowledge until after the fact, and (3) notwithstanding Ms. Bricker's opposition to the continued operations "of Media Distributors *at all*." (Emphasis added.) (Divorce Decree at 7.)

{¶ 53} At the outset, we note that the conduct at issue occurred in 2003 and 2004—over 13 years before the de facto termination date of the parties' marriage. No evidence presented at trial suggested Mr. Hall liquidated funds held in his retirement accounts in anticipation of an impending divorce, during the parties' separation, or while divorce proceedings were ongoing. *E.g.*, *Hammond*, 1995 Ohio App. LEXIS 3975 at *9-10. We next turn to the merits of the trial court's substantive findings and analysis.

{¶ 54} Relying on email correspondence between the parties from May 2007, the trial court found Ms. Bricker was not supportive of Mr. Hall's continued operation of Media Distributors "at all." (Divorce Decree at 7, citing Ex. KK1.) True, Ms. Bricker testified that their accountant told Mr. Hall "in about 2005" "to stop buying inventory" and "to sell down what you have." (Tr. Vol. IV at 675-76.) And Ms. Bricker described realizing "by 2006" that Media Distributors was unable to support the family and things "really hit[ing] the wall by 2007." (Tr. Vol. IV at 711-12.) Suffice it to say that Ms. Bricker is likely correct in her belief that Mr. Hall should have ceased operations much earlier than he ultimately did. Nonetheless, Mr. Hall's decision to continue operating Media Distributors *after* 2004 is not relevant to the issue of whether he committed financial misconduct in 2003 and 2004 when he liquidated his retirement accounts and invested those funds in his business.

{¶ 55} On review, we find no evidence in the record before us to suggest that Ms. Bricker was opposed to Mr. Hall's continued operation of Media Distributors in 2003 and 2004. Ms. Bricker explicitly testified she was supportive of Mr. Hall's decision to leave his corporate job and start Media Distributors "in early 2000 when I made that choice." (Tr. Vol. IV at 710-11, 753-54.) Indeed, before he opened Media Distributors, Mr. Hall had success working for different video wholesale and distribution companies. (*See* Tr. Vol. I at 48-52; Tr. Vol. II at 272-74; Tr. Vol. III at 478-79, 532-35, 565-70; Tr. Vol. IV at 673, 709-10; Ex. G2.) In other words, he had valuable knowledge and experience for operating a VHS resale ecommerce business that used new online platforms like eBay. Ms. Bricker herself noted that "eBay was kind of a new thing" when Mr. Hall started Media Distributors and that Mr. Hall had been "doing well with the business" and "really believed that he had the skill set and * * * could make it work." (Tr. Vol. IV at 711, 753-54.)

{¶ 56} Even *after* Ms. Bricker learned about Mr. Hall's liquidated retirement accounts in April 2004, she cosigned the HELOC taken out on the parties' marital home for the purposes of paying Media Distributors's debt and financing its continued growth. (*See* Tr. Vol. III at 463-74; Tr. Vol. IV at 606-10, 659-61; Ex. BB1.) And Ms. Bricker acknowledged that when she agreed to the HELOC in April 2004, she still supported Mr. Hall's continued efforts with his business. (*See* Tr. Vol. IV at 754.)

{¶ 57} For these reasons, we find no competent, credible evidence in the record to support the finding that Ms. Bricker "was against [Mr. Hall's] continuing the operations of Media Distributors at all" when the retirement funds were invested into his business in 2003 and 2004. (*See* Divorce Decree at 7.) At most, the evidence on which that finding was based—a May 2007 email from Ms. Bricker to Mr. Hall—showed Ms. Bricker expressing her desire that he cease operations of Media Distributors and referencing a discussion they had about his inventory management in 2005. (*See* Divorce Decree at 7, citing Ex. KK1. *See also* Tr. Vol. III at 486-88; Tr. Vol. IV at 675-79.)

{¶ 58} We also find no support in the record for the trial court's determination that Mr. Hall's use of marital assets to pursue "the 'passion' of his business venture * * * at the expense of the family" was for a non-marital purpose. (Divorce Decree at 7.) Were it the case that Mr. Hall's passion vastly outweighed his work ethic, that might be true. But the evidence did not suggest that here, as Ms. Bricker herself testified multiple times about Mr.

Hall being a hard worker, talented, smart, and expending a substantial amount of his time and energy on his Media Distributors's business. (*See* Tr. Vol. IV at 712-13, 719, 750-51, 772-74, 792. *See also* Tr. IV at 673 (Ms. Bricker describing Mr. Hall as a "very successful business person [sic]" while noting that he "clearly has a passion for" his new records resale business).)

{¶ 59} Significantly, the evidence ***only*** showed that Mr. Hall liquidated his retirement accounts and invested those funds into Media Distributors. *Compare Robinson v. Robinson*, 12th Dist. No. CA2012-11-118, 2013-Ohio-4435 (affirming distributive award based on financial misconduct where husband withdrew $114,000 from a retirement account without wife's consent or knowledge, wife's lack of participation in the decision to withdraw these funds was contrary to the practice followed by husband in the two prior withdrawals of retirement funds, husband gave withdrawn funds to a friend, and wife testified friend gambled with the money). In other words, there was no allegation that Mr. Hall spent the retirement funds on, for instance, a paramour, *e.g.*, *Sullinger v. Sullinger*, 6th Dist. No. L-18-1079, 2019-Ohio-1489, ¶ 74-75, or gambling, *e.g.*, *Putman v. Putman*, 12th Dist. No. CA2008-03-029, 2009-Ohio-97, ¶ 12-16.

{¶ 60} Notably, too, Mr. Hall did generate an income in the seven years after he invested his retirement funds into his business. (*See* Ex. G2; Tr. Vol. III at 480, 487-88.) Ms. Bricker earned no income in 2004, 2005, and 2006, and reported comparatively meager earnings in 2007. (Ex. 66.) In the 2007 email correspondence between the parties produced by Ms. Bricker at trial, Mr. Hall repeatedly lamented being the sole income provider for the family for over four years—i.e., between 2003 and 2007. (Ex. KK1 ("It[']s been 4 plus years of just Media income.").) Ms. Bricker acknowledged that Mr. Hall paid on the principal mortgage for the parties' marital residence up until around 2007 or 2008. (Tr. Vol. IV at 605-07.) Given that Ms. Bricker was not working between fall 2003 and fall 2007 (*e.g.*, Tr. Vol. IV at 682; Ex. 66), it is difficult to see how investing marital assets into the only potential source of income at that time—Mr. Hall's Media Distributors business— would ***not*** have been for a "marital purpose."

{¶ 61} Although Ms. Bricker took issue with the lack of financial security that often comes with owning a business, it is undisputed that Mr. Hall was the sole income earner for the family in 2004, when the bulk of his retirement account funds were liquidated and

invested into his business. (*See* Tr. Vol. IV at 677-82; Ex. 66; Ex. G2; Ex. GG.) As such, neither Ms. Bricker's ultimate return to work in the fall of 2007 (Tr. Vol. IV at 682) nor her testimony that Mr. Hall's income from Media Distributors was "[l]ow, spotty, at best" between 2007 and 2014/2015 (*see* Tr. Vol. IV at 678) changes the fact that, ***in 2004***, Mr. Hall's income from his Media Distributors business was the family's sole source of income.[2] (*Compare* Ex. G2, *with* Ex. 66.)

{¶ 62} For these reasons, we conclude the trial court's finding that Mr. Hall used his retirement accounts for a "non-marital" purpose is not supported by competent, credible evidence in the record.

{¶ 63} This brings us to a broader point raised by Ms. Bricker: that Mr. Hall mismanaged marital finances by using his retirement account funds to buy "tons of product" in a "softening business, which was predictable with the format change" from VHS tape to DVD. (Ex. KK1; Tr. Vol. IV at 680 (Ms. Bricker reading from her May 5, 2007 email to Mr. Hall). *See also* Tr. Vol. IV at 773). But this is not the same as financial misconduct.

{¶ 64} We have repeatedly made clear that "financial misconduct" requires a showing of "knowing wrongdoing;" for example, where one party either profits or ***intentionally*** diminishes the value of another party's share of the marital estate. *See, e.g., Best*, 2011-Ohio-6668 at ¶ 17. Mr. Hall's decision to invest in a product that became outmoded by DVDs over time was a poor decision and resulted in a large loss. At the same time, we find no evidence in the record to suggest—and the trial court did not find—that Mr. Hall ***personally*** profited from his investment or ***intentionally*** sought to diminish Ms. Bricker's share of the marital estate. Rather, every indication is that Mr. Hall suffered just as much loss as Ms. Bricker. *E.g., Jacobs*, 2003-Ohio-3466 at ¶ 23; *Tate*, 2018-Ohio-1244 at ¶ 109. While spouses broadly have some fiduciary responsibility toward each other, holding spouses accountable to each other under, for instance, a prudent investor[3] standard

---

[2] Furthermore, because the parties were itemizing their deductions when they filed their joint tax returns prior to 2014 and Media Distributors was a limited liability company—meaning everything it made or lost passed through to their personal income—it is probable the parties saved on tax liabilities due to Media Distributors's reported losses. (*See* Tr. Vol. III at 575-76; Tr. Vol. IV at 729-31; Ex. KK1. *See also* Tr. Vol. I at 97.)

[3] In general, trust investment law is governed by the prudent investor rule. R.C. 5809.02(A) requires a trustee to "invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this requirement, the trustee shall exercise reasonable care, skill, and caution."

is " 'simply unworkable in the context of a divorce proceeding.' " *Bucalo*, 2005-Ohio-6319 at ¶ 24, quoting *Mikhail*, 2005-Ohio-322 at ¶ 32.

{¶ 65} Central to the trial court's finding that Mr. Hall engaged in wrongdoing was Ms. Bricker's testimony that "she was not made aware of [Mr. Hall] liquidating his retirement accounts until after the fact." (Divorce Decree at 7, citing Tr. Vol. IV at 659-60.) But, as described below, we do not find such evidence sufficient for the trial court to find there was financial misconduct given the facts and circumstances of this case.

{¶ 66} The trial court found that Mr. Hall received disbursements from his retirement accounts as follows: $24,000 on January 31, 2003; $115,000 on February 18, 2004; $50,000 on July 28, 2004; and $35,885 on October 5, 2004. (Divorce Decree at 9, citing Ex. GG.) Ms. Bricker testified she learned about Mr. Hall's retirement liquidation in April 2004 from Mr. Hall himself (Tr. Vol. IV at 660), while Mr. Hall maintained that Ms. Bricker knew he intended to liquidate his retirement accounts beforehand (*see* Tr. Vol. III at 523-30, 570-71). But even by Ms. Bricker's account, two retirement disbursement payments (totaling $85,855) were issued *after* the parties discussed Mr. Hall's retirement liquidation (Tr. Vol. IV at 660) and executed the paperwork opening the HELOC on their marital residence in April 2004 (Ex. BB1). (*See* Ex. GG.)

{¶ 67} Even assuming Ms. Bricker had no knowledge of Mr. Hall's intention to liquidate his retirement accounts before he did so, we do not believe wrongful scienter can be imputed to that fact alone, based on the facts and circumstances of this case. Notably, the trial court did not find Mr. Hall *intentionally* concealed his actions from Ms. Bricker. In fact, evidence showed that all of Mr. Hall's retirement account statements, disbursement checks, and bank wire disbursement notices were mailed to the parties' marital residence in 2003 and 2004 when, we note, Ms. Bricker was staying home with their children. (*See* Ex. GG; Tr. Vol. III at 570-72.) And, given that Ms. Bricker described learning from their accountant each year "over probably 2004 * * * through probably 2006 or 2007" about tax penalties incurred because of Mr. Hall's retirement account disbursements (Tr. Vol. IV at 660-61), it is likely Ms. Bricker would have known by early 2004 that Mr. Hall received a $24,000 disbursement in January 2003. (*See* Ex. GG.) Significantly, too, Ms. Bricker did not claim Mr. Hall lied to her or hid mail from her in 2003 or 2004; indeed, she testified

Mr. Hall disclosed the liquidation to her in April 2004 on his own volition. (*See* Tr. Vol. IV at 659-61.)

{¶ 68} On review, there is no real evidence in the record before us to suggest Mr. Hall engaged in some type of wrongdoing when he received disbursements from his retirement accounts and invested those funds into Media Distributors in 2003 and 2004. *Compare Smith v. Emery-Smith*, 190 Ohio App.3d 335, 2010-Ohio-5302, ¶ 51-56 (11th Dist.) (affirming financial misconduct finding where wife sold stocks husband received as an inheritance from his parents—"unquestionably [husband's] separate property"— without his knowledge or approval while husband was hospitalized and wife had a civil protection order in place preventing him from contacting her); *Donnelly v. Donnelly*, 2d Dist. No. 2002-CA-53, 2003-Ohio-1377, ¶ 2-15 (husband committed financial misconduct when, shortly before and during divorce proceedings, husband outright transferred property and assets without wife's knowledge or approval, largely in violation of temporary restraining order prohibiting him from disposing of any real or personal property and from transferring or withdrawing any funds in any bank account or pension fund while divorce proceedings were ongoing).

{¶ 69} By all accounts, Mr. Hall wanted, hoped, and believed in 2003 and 2004 that he could make his Media Distributors venture a financial success. And certainly, if his business turned a considerable profit, it is unlikely the financial misconduct finding would have been made by the trial court or argued by Ms. Bricker. But the fact that his business became unprofitable has no bearing on the issue of whether Mr. Hall acted with the wrongful scienter required to make a financial misconduct finding. To be sure, Ms. Bricker, herself, did not suggest Mr. Hall acted with the wrongful scienter required for the trial court to make a financial misconduct finding. Indeed, she opined that Mr. Hall "is an eternal optimist" who "wants to make something work, even when you are upside down financially." (Tr. Vol. IV at 675.)

{¶ 70} Although Mr. Hall's investment of his retirement funds into Media Distributors may have been risky or ultimately unwise, in the end, no evidence suggested he profited from his actions or sought to intentionally defeat Ms. Bricker's distribution. *Compare Gentile v. Gentile*, 8th Dist. No. 97971, 2013-Ohio-1338, ¶ 56 (finding no abuse of discretion in trial court's failure to find husband engaged in financial misconduct where,

although husband acted deceptively in relation to a $350,000 investment, he did not profit from his actions or intentionally defeat the wife's distribution).

{¶ 71} At most, then, Ms. Bricker's testimony established that Mr. Hall did not consult with her before he received disbursements from his retirement accounts and invested them into his business. Although it stands to reason that mutual assent by both spouses to financial decisions involving marital assets is certainly prudent in most marriages, failing to consult with one's spouse before expending marital assets does not, on its face, constitute sufficient evidence for a domestic court to find there was financial misconduct under the facts and circumstances presented in this case.

{¶ 72} In its analysis, the trial court also cited to Mr. Hall's actions *after* Ms. Bricker knew his retirement accounts had been liquidated and agreed to open a HELOC on their home as further support for its finding that Mr. Hall committed financial misconduct. Specifically, the trial court found Mr. Hall's "deliberate shift of [his] retirement account mail to a P.O. Box [in 2005] instead of the marital home" struck it "as an attempt to conceal his dissipation of the retirement accounts by [Mr. Hall]." (Divorce Decree at 8.)

{¶ 73} It is without question that, in 2005, Mr. Hall changed the mailing addresses for at least the HELOC account and his retirement accounts—and likely other personal accounts—from the parties' marital residence to the P.O. Box he used for Media Distributors. (*See* Ex. BB3; Tr. Vol. III at 523-24; Tr. Vol. IV at 660-61.) Initially, we note that Mr. Hall testified the P.O. Box at issue was—and had been long before 2005—the mailing address for Media Distributors. (*See* Tr. Vol. III at 523.) Nothing in the record refuted that testimony or otherwise suggested Mr. Hall obtained that P.O. Box with any nefarious purpose—much less to conceal financial statements from Ms. Bricker.

{¶ 74} Ms. Bricker testified that Mr. Hall told her he made this change because she had been opening his mail (Tr. Vol. IV at 661-62, 779-80), while Mr. Hall maintained it was done to ensure he timely received, reviewed, and paid family expenses since he was spending a lot of time at his business during that time frame. (*See* Tr. Vol. III at 523-25, 530, 571-72.) Of note, Mr. Hall's explanation was at least consistent with Ms. Bricker's testimony that Mr. Hall "was singularly focused on Media Distributors," "never home," and "spent long hours there." (Tr. Vol. IV at 708-09, 712-13.) Mr. Hall expressly disclaimed

changing the mailing addresses for some accounts in 2005 so Ms. Bricker would not know he had cashed out his retirement accounts in 2004. (Tr. Vol. III at 571-72.)

{¶ 75} Moreover, we believe the record arguably suggests—though does not definitely establish—that Mr. Hall may have changed the mailing address for other nonretirement accounts around that same time. (*See* Tr. Vol. III at 523-25; Tr. Vol. IV at 661-62.) Evidence showed Mr. Hall also changed the mailing address for the HELOC account opened with Fifth Third Bank to Media Distributors's P.O. Box in March 2005. (*See* Ex. BB3; Ex. J3.) Given Mr. Hall was the sole income earner in 2005 and Ms. Bricker's position that Mr. Hall should be solely responsible for making the payments on the HELOC (*see* Tr. Vol. IV at 607-08; Ex. BB2), we believe the change in mailing address for the HELOC account—and, possibly others (*see* Tr. Vol. IV at 661-62)—undermines the trial court's reasoning as to the import of the 2005 P.O. Box change for its financial misconduct finding. (*See* Divorce Decree at 8.)

{¶ 76} But even assuming Mr. Hall changed his mailing address to the P.O. Box because he took issue with Ms. Bricker opening mail that was addressed to him, that fact is neither inconsistent with his stated desire to receive and review his mail in a timely fashion nor inherently indicative of knowing wrongdoing rising to the level of financial misconduct. And certainly, under the facts of this case, it does not suggest Mr. Hall was trying to "conceal his dissipation of the retirement accounts," as the trial court found. (Divorce Decree at 8.)

{¶ 77} It remains an uncontroverted fact that Ms. Bricker was aware of Mr. Hall's liquidated retirement accounts both ***before*** and ***after*** he changed his mailing address in 2005. (*See* Tr. Vol. IV at 659-61; Ex. KK1.) And, most significantly, correspondence concerning the retirement disbursements Mr. Hall received between January 2003 and October 2004—including disbursement checks—***was mailed*** to the marital residence during the period when Ms. Bricker was not working and Mr. Hall was "never home." (*See* Ex. GG; Tr. Vol. III at 571-72; Tr. Vol. IV at 708-09, 712-13.) Certainly, if Mr. Hall's mailing address changes were indicative of his "attempt to conceal his dissipation of the retirement account" as the trial court found (Divorce Decree at 8), they would have been made in 2003 and 2004, ***before*** the disbursements checks and wire transfer confirmations were mailed to the marital home.

{¶ 78} We fail to see how the mailing address changes in 2005 could be viewed as

an attempt to conceal from Ms. Bricker information she already possessed by April 2004—much less suggest that Mr. Hall engaged in any purposeful wrongdoing with respect to the retirement accounts he liquidated and reinvested into Media Distributors in 2003 and 2004. Had the trial court found that Mr. Hall committed financial misconduct by, for instance, telling Ms. Bricker he used funds from the HELOC or other marital assets to replenish his liquidated retirement accounts[4] when, in fact, they were invested into his business, then Mr. Hall's address changes in 2005 may have supported such finding. But it was Mr. Hall's decision to liquidate his retirement accounts in 2003 and 2004—not his actions thereafter—that formed the factual basis for the trial court's financial misconduct finding in this case.

{¶ 79} Based on our review, we find the decision classifying Mr. Hall's liquidation of his retirement accounts as financial misconduct is against the manifest weight of the evidence. Though his decisions to continue acquiring inventory and operating Media Distributors long after VHS tapes had become obsolete were certainly unfortunate, those actions do not satisfy the scienter or wrongdoing requirements for establishing financial misconduct under R.C. 3105.171(E)(4).

{¶ 80} Accordingly, we reverse the trial court's finding of financial misconduct. This determination does not, however, resolve Mr. Hall's second assignment of error concerning the unequal division of the marital retirement assets held in Ms. Bricker's name, as the trial court also based its decision to award all of the assets to Ms. Bricker "on an equitable basis." (*See* Divorce Decree at 9-10, 29.)

### 3. Equitable Considerations

{¶ 81} Notwithstanding our determination that the trial court acted contrary to law when it made a distributive award from marital assets and our conclusion that its financial

---

[4] We note that Ms. Bricker testified the parties "refinanced, got the money back in [to Mr. Hall's retirement accounts]" in 2004, but that Mr. Hall "changed the P.O. Box [in 2005], and it's gone." (Tr. Vol. IV at 660-61. *See also* Ex. BB3.) Mr. Hall maintained, however, that he never put any money back into his retirement accounts. (Tr. Vol. III at 525.) Notably, Ms. Bricker did not produce any documents at trial establishing when and how much (if any) was returned to Mr. Hall's retirement accounts after they were liquidated. And, it is unclear how, other than possibly receiving a lower interest rate, refinancing their home would have provided a means through which Mr. Hall could have returned any money to his liquidated retirement accounts. (*See* Tr. Vol. IV at 608-11, 659-62.) While the HELOC taken out on the parties' home obviously provided them with additional capital, Ms. Bricker unequivocally testified it was taken out "for the purpose of paying Media Distributors'[s] debt." (Tr. Vol. IV at 609-11.) As such, we do not find sufficient evidence in the record to establish that any funds were, in fact, returned to the retirement accounts at issue after Mr. Hall liquidated them in 2003 and 2004. And we note the trial court did not find that funds ever were.

misconduct finding is against the manifest weight of the evidence, we still must determine whether the trial court's unequal division of the marital retirement assets held in Ms. Bricker's name—100 percent to Ms. Bricker and 0 percent to Mr. Hall—was proper "on an equitable basis, even absent a finding of financial misconduct" under the statutory framework of R.C. 3105.171. (Divorce Decree at 9.)

{¶ 82} Initially, we note that although R.C. 3105.171(E)(2)'s aim is "equity between the spouses," it does not authorize a trial court to make a greater award of marital property. Instead, it permits "a distributive award in lieu of a division of marital property in order to achieve equity between the spouses, if the court determines that a division of the marital property in kind or in money would be impractical or burdensome." R.C. 3105.171(E)(2). Because a distributive award cannot be from marital assets, the trial court's unequal division of the marital retirement accounts is not authorized by this statutory provision.

{¶ 83} The statutory authority for the unequal division of marital assets is instead found in R.C. 3105.171(C)(1). Under that provision, a trial court can divide marital property "between the spouses in the manner the court determines equitable" if it finds that "an equal division of marital property would be inequitable." R.C. 3105.171(C)(1). In "making a division of marital property," the trial court must consider "all relevant factors," including those expressly enumerated in R.C. 3105.171(F). *Id.* This includes "[a]ny other factor that the court expressly finds to be relevant and equitable." R.C. 3105.171(F)(10).

{¶ 84} In finding an equitable distribution payment of $376,275 would be inequitable in this case, the trial court stated the following:

> The primary assets driving the difference in distribution are [Ms. Bricker's] retirement accounts which represent 69.63% of the parties['] net marital assets. But as the Court noted in Section II(B)(8), these retirement accounts are the subject of a distributive award due to [Mr. Hall's] financial misconduct and/or equitable considerations. To then order an equalization payment would undercut those findings by the Court as well as the equity of this decree.
>
> In the interest of fairness and equity, the Court therefore declines to order an equalization payment in this case.
>
> The Court finds this division equitable due to the [R.C. 3105.171(F)] findings regarding the parties' retirement accounts above, the duration of the marriage, the nature of the

assets and liabilities of the parties, the parties' current and future incomes, [Mr. Hall's] desire to retain his business interest intact, and the respective conduct of the parties.

(Divorce Decree at 29.)

**{¶ 85}** Notably, the trial court's finding that an unequal distribution of marital assets is equitable in this case relied in large part on its financial misconduct finding (which we have now determined was against the manifest weight of the evidence) and its determination that Ms. Bricker was entitled to a distributive award (which, as explained above, was improper because it was made from marital property).

**{¶ 86}** Nonetheless, since the trial court clearly found the equal division of the marital retirement accounts held in Ms. Bricker's name would be inequitable in this case and it was authorized to unequally divide marital property under R.C. 3105.171(C)(1), we will proceed to analyze whether the trial court erred and abused its discretion when it found that an equalization payment of $376,275 from Ms. Bricker to Mr. Hall was inequitable in this case. *See Caleshu*, 2020-Ohio-4075 at ¶ 9.

**{¶ 87}** On appeal, Mr. Hall takes issue with several of the "subsidiary" factual findings underpinning the trial court's ultimate determination that an equal division of the marital retirement accounts held in Ms. Bricker's name would be inequitable. (*See* Brief of Appellant at 28-43, discussing Divorce Decree at 9-10, 29.)

**{¶ 88}** Because the trial court's financial misconduct finding was against the manifest weight of the evidence and its valuation of Ms. Bricker's Revlon pension was error, as discussed below, we cannot ascertain what the trial court would have done absent these erroneous findings. As such, we must remand this matter to the trial court for a recalculation and division of marital assets. We thus decline to address the propriety of the subsidiary factual findings with which Mr. Hall takes issue in this appeal, and instead turn to the merits of Mr. Hall's first assignment of error.

#### 4. Valuation of Ms. Bricker's Revlon Pension

**{¶ 89}** In his first assignment of error, Mr. Hall contends the trial court erred and abused its discretion by valuing Ms. Bricker's unmatured Revlon pension at $1. (Brief of Appellant at 11-12.)

### a. Legal Standards

{¶ 90} Pension and retirement benefits earned during a marriage are marital assets. *See Ford v. Ford*, 10th Dist. No. 14AP-954, 2015-Ohio-3571, ¶ 9, citing R.C. 3105.171; *Cameron v. Cameron*, 10th Dist. No. 12AP-349, 2012-Ohio-6258, ¶ 9; *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 178 (1990). While a pension held by the participant spouse is not necessarily subject to direct division between the participant spouse and the nonparticipant spouse, it is still " 'subject to evaluation and consideration in making an equitable distribution of both parties' marital assets.' " *Cameron* at ¶ 9, quoting *Hoyt* at 180.

{¶ 91} Retirement plans are generally classified as either a defined-benefit plan or a defined-contribution plan. *Thompson v. Thompson*, 196 Ohio App.3d 764, 2011-Ohio-6286, ¶ 29 (10th Dist.). In a defined-benefit plan, the participant's benefit is defined by a plan formula that provides for the payment of a monthly check for life upon retirement. *Id.* at ¶ 29. "Unlike a defined contribution plan, the amount of a member's contribution (if any) to a defined benefit plan plays no role in the computation of the value of the benefit." *Id.* The actual value of a defined-benefit plan that is the subject of a court's equitable distribution can be determined only by future contingencies such as the participant's age, highest salary at retirement, and pension service credits at retirement. *Id.*; *Pruitt v. Pruitt*, 8th Dist. No. 84335, 2005-Ohio-4424, ¶ 53. Pursuant to a defined-contribution plan, such as a 401(k) plan, profit-sharing plan, money-purchase plan, thrift plan, or employee stock-option plan, the employee and/or employer contributes to the employee's account and the value of the plan is the account balance. *Hoyt* at 180, fn. 11.

{¶ 92} Eligibility to receive pension benefits depends on whether the benefits are vested and mature. *Thompson* at ¶ 30. Pension benefits vest once the employee has been employed for a predetermined number of years, and vested pension benefits are not subject to forfeiture even if the employee leaves the employer. *Id.* at ¶ 30. Pension benefits are mature when the plan provides for distribution and payments are due and payable to the employee. *Id.* at ¶ 31, citing *Erb v. Erb*, 75 Ohio St.3d 18, 20 (1996). Conversely, pension benefits are not mature when payment is delayed until some future date. *Erb* at 20.

{¶ 93} Generally, a trial court may divide a pension fund using the "present value" method or the "deferred distribution" method. *Hoyt* at ¶ 181. The "present value" method requires a trial court to place a present cash value on the benefit as of the date of the final divorce decree and divide that value between the parties. *See Daniel v. Daniel*, 139 Ohio

St.3d 275, 2014-Ohio-1161, ¶ 11, citing *Cohen v. Cohen*, 937 S.W.2d 823, 831 (Tenn.1996), and *Hoyt* at 181. Under this method, the trial court determines the amount the non-employee spouse is to receive, and then orders that amount be either (1) withdrawn from the pension fund, or (2) offset with installment payments or other marital property. *Newell v. White*, 4th Dist. No. 05CA27, 2006-Ohio-637, ¶ 7, citing Baldwin's Ohio Domestic Relations Law, Section 25.05(E)(3), at 274 (1990).

{¶ 94} Under the "deferred distribution" method, the trial court devises a formula for dividing the monthly benefit at the time of the decree, orders that a percentage of the future benefits be paid from the pension fund to the non-employee spouse if and when the pension matures, but defers distribution until the benefits become payable. *See Daniel* at ¶ 11, citing *Cohen* at 831, and *Hoyt* at 181. *See also Newell* at ¶ 7, citing Baldwin's Ohio Domestic Relations Law, Section 25.05(E)(3), at 274 (1990). A trial court may determine the parties' proportional shares of the benefits at the time of the divorce, or it may defer the proportionality determination until the benefits mature. *Thompson* at ¶ 32, citing *Erb* at 21, and *Hoyt* at 182. "In the latter situation, the trial court must reserve jurisdiction so that it can revisit the division of the pension benefits when they mature." *Id.*

{¶ 95} "The 'coverture fraction' refers to a formula used to equitably divide a defined benefit plan that has not yet matured" under the deferred distribution method. *See Saks v. Riga*, 8th Dist. No. 101091, 2014-Ohio-4930, ¶ 20, citing *Daniel* at ¶ 14-15. *See also Johnson v. McCarthy*, 10th Dist. No. 17AP-655, 2019-Ohio-3489, ¶ 18-22 (describing the traditional coverture and the frozen coverture methods to divide pension benefits that are vested, but not mature, at the time of a divorce). The formula divides the number of years of creditable service during the marriage (the numerator) by the total number of years of creditable service at the time the employee would retire (the denominator). *Daniel* at ¶ 15, quoting *Thompson* at ¶ 33. "Once a pension member retires, the defined benefit plan administrator multiplies the monthly accrued benefit by the coverture fraction." *Thompson* at ¶ 33, citing *Long v. Long*, 176 Ohio App.3d 621, 2008-Ohio-3006, ¶ 60, (2d Dist.), fn. 6. "The resulting sum is the marital portion of the pension benefit." *Saks* at ¶ 20. "Generally, the trial court will award the non-member spouse half of that marital portion to achieve an equal division." *Thompson* at ¶ 33, citing *Meeker v. Skeels*, 6th Dist. No. L-

09-1190, 2010-Ohio-3525, ¶ 14, and *Makar v. Makar*, 7th Dist. No. 02-CA-37, 2003-Ohio-1071, ¶ 20.

{¶ 96} In *Hoyt*, the Supreme Court of Ohio approved the division of a vested but unmatured pension benefit by the use of a qualified domestic relations order but rejected the claim that the trial court must always use the present vested value of a plan in reaching its division of property. *Hoyt*, 53 Ohio St.3d at 183-84. And, indeed, in *Daniel*, the court held that use of the coverture fraction to divide unmatured pension benefits—whether at the time of divorce or later—is a "reasonable method[] of achieving equity." *Daniel*, 2014-Ohio-1161 at ¶ 14.

{¶ 97} We recognize the difficulties trial courts face when valuing and dividing retirement benefits. This is why, "[w]hen considering pension or retirement benefits, a trial court must be given discretion" and "have the flexibility to make an equitable decision based upon the circumstances of the case, the status of the parties, the nature, terms and conditions of the pension plan, and the reasonableness of the result." (Citations omitted.) *Hoyt* at 180. In dividing a pension or retirement benefit, a trial court should attempt to both "preserve the pension or retirement asset in order that each party can procure the most benefit" and "disentangle the parties' economic partnership so as to create a conclusion and finality to their marriage." *Hoyt* at paragraph two of the syllabus. It is not always possible, however, to serve both goals. Nonetheless, a trial court "should attempt to ascertain the optimum value the pension or retirement benefit has to the parties as a couple." *Hoyt* at 183.

### b. Analysis

{¶ 98} Evidence at trial established that Ms. Bricker's Revlon retirement plan would pay Ms. Bricker a monthly benefit of $1,877 upon her retirement date of July 1, 2026. (*See* Ex. 35; Tr. Vol. IV at 658-59.) There is no dispute that Ms. Bricker's Revlon pension is a defined-benefit plan, and that, on the date of divorce, Ms. Bricker's benefits thereunder were vested, but not mature. Nor is there any question that Ms. Bricker's Revlon pension is a marital asset subject to division and allocation between the parties. Rather, Mr. Hall takes issue with the trial court's valuation of the Revlon pension at $1, arguing in his first assignment of error that such valuation constituted an abuse of discretion.

{¶ 99} At the outset, we note that unmatured defined-benefit pensions are often valued using the coverture fraction and divided under the deferred distribution method. *See, e.g., Saks*, 2014-Ohio-4930 at ¶ 49-50; *Johnson*, 2019-Ohio-3489 at ¶ 18-22. However, in this case, the trial court instead summarized the present cash value of Ms. Bricker's defined-contribution plans (IRA and 401(k)) and determined that Ms. Bricker's Revlon pension had a present cash value of $1. (Divorce Decree at 6.) But, as extensively addressed in our analysis of Mr. Hall's second assignment of error, the trial court did not divide any of Ms. Bricker's retirement benefits as marital property. Instead, it found that Ms. Bricker was entitled to a "distributive award" because of Mr. Hall's financial misconduct and on the basis of equity. (Divorce Decree at 7-10.)

{¶ 100} On appeal, Ms. Bricker posits that even if the trial court erred in its valuation of the Revlon pension, any such error was harmless because the trial court's financial misconduct finding against Mr. Hall "was not confined to the issue of retirement accounts." (Brief of Appellee at 15-16.) Ms. Bricker asserts "the trial court clearly implied that the amount in controversy resulting from [Mr. Hall's] financial misconduct exceeded the total value of all of [Ms. Bricker's] retirement accounts." (Brief of Appellee at 16.) But because we have already determined that the trial court's financial misconduct finding is against the manifest weight of the evidence, Ms. Bricker's harmless error argument is not compelling.

{¶ 101} Neither party presented evidence regarding the present-day value of Ms. Bricker's Revlon pension at trial. *Compare Saks* at ¶ 19-20, 45-55 (describing expert testimony presented by both parties regarding the valuation and division of wife's unmatured pension); *Mann v. Mann*, 4th Dist. No. 09CA38, 2011-Ohio-1646, ¶ 4-6, 21-24 (the same). Mr. Hall suggests this was because he assumed the trial court would equally divide the monthly pension benefit using a qualified domestic relations order. (Reply Brief of Appellant at 1-2.) Based on our review of the record, it appears that—irrespective of their value—the trial court had no intention of awarding Mr. Hall any percentage of the marital retirement assets held in Ms. Bricker's name because it found he committed financial misconduct. (*See* Divorce Decree at 6-10, 29.) As such, we surmise the trial court did not see any need to order the parties to submit additional evidence or to appoint an appraiser valuing Ms. Bricker's Revlon pension.

{¶ 102} Given that we have now determined there is no evidence to suggest Mr. Hall engaged in any purposeful wrongdoing or acted intentionally to defeat marital assets, however, any unequal division of the marital retirement accounts had to be grounded in equity. More precisely, the trial court needed to find that ordering Ms. Bricker to make an equalization payment to Mr. Hall would be inequitable when considering the factors found in R.C. 3105.171(F). *See* R.C. 3105.171(C)(1). While we do not require the trial court to use any particular method of valuation, it must base its valuation of Ms. Bricker's unmatured Revlon pension on competent, credible evidence if it intends to value and divide the marital retirement accounts using the present cash value method.[5] Because there is no evidence in the record regarding the value of Ms. Bricker's Revlon unmatured pension, the trial court abused its discretion when it valued it at $1.

### 5.  Disposition of First and Second Assignments of Error

{¶ 103} In sum, the trial court's analysis regarding the valuation and division of the marital assets held in Ms. Bricker's name suffers from multiple errors. The trial court improperly made a "distributive award" from the unequal division of marital assets. *See* R.C. 3105.171(A)(1). Classifying Mr. Hall's decision to liquidate his retirement accounts and invest those funds into his business as financial misconduct was against the manifest weight of the evidence. The trial court's desire for Ms. Bricker's retirement accounts to stay intact is understandable, and Mr. Hall's use of marital assets to invest in his ultimately unsuccessful business is certainly unfortunate. And an unequal division of marital assets may be equitable under R.C. 3105.171(C)(1). But, as currently written, the decision's equity analysis under that provision is inadequate because it heavily relies on the erroneous financial misconduct finding and calculates Ms. Bricker's equalization payment using an inaccurate valuation of the marital retirement assets held in Ms. Bricker's name (due to the unsupported and de minimis valuation of her unmatured Revlon pension at $1).

{¶ 104} Based on the foregoing, we sustain Mr. Hall's first assignment of error in full and second assignment of error in part, reverse the trial court's finding of financial misconduct, and remand this matter to the trial court to value and distribute the marital property in a manner consistent with this decision and R.C. 3105.171.

---

[5] We also note that, when engaging in the analysis required by R.C. 3105.171(C)(1), a trial court cannot value and divide a marital asset—here, Mr. Hall's liquidated retirement accounts (*see* Divorce Decree at 9)—that no longer exists. *See, e.g.*, *Newman v. Newman*, 10th Dist. No. 11AP-373, 2012-Ohio-2467, ¶ 21.

**B.  Third Assignment of Error**

{¶ 105} Mr. Hall's third assignment of error relates to the HELOC debt the parties took out on their marital residence in April 2004.  (*See* Ex. BB1.)  As of December 5, 2017, the parties owed $105,223 on that debt.  (Divorce Decree at 5.  *See* Ex. J3.)

{¶ 106} It was undisputed the HELOC debt was secured to aid Mr. Hall's now-defunct business.  (Tr. Vol. III at 463-69; Tr. Vol. IV at 606-12.)  It was also undisputed that, up until October 2017, all payments towards the HELOC debt were made from funds in Mr. Hall's business accounts.  (*See* Ex. BB2; Tr. Vol. III at 471; Tr. Vol. IV at 607-12.)  After Mr. Hall moved out of the marital residence in the fall of 2017 (Tr. Vol. II at 280; Tr. Vol. IV at 602-03), he stopped making the monthly payments for the HELOC debt.  (Tr. Vol. III at 469-74; Ex. 76.)  Ms. Bricker testified that from December 2017 to the time of trial, she paid $22,330.86 on the HELOC.  (Tr. Vol. III at 471-73; Tr. Vol. IV at 610-16; Ex. 76.)

{¶ 107} At trial, Ms. Bricker maintained the HELOC debt should be allocated to Mr. Hall separately because it was taken out for the purpose of paying Media Distributors's debt.  (*See* Tr. Vol. IV at 606-16, 766-67, 785.)  Although Mr. Hall generally conceded the HELOC was obtained to help finance his business (Tr. Vol. II at 287-88; Tr. Vol. III at 463-71), he asserted it should be classified as a marital debt because it encumbers the deed of the marital home.  (Tr. Vol. II at 189-90, 287; Tr. Vol. III at 470-71.)

{¶ 108} Finding it would be inequitable to hold Ms. Bricker equally responsible for this debt, the trial court allocated the HELOC to Mr. Hall as a separate debt.  (Divorce Decree at 4-5, 26.)  The trial court thus found that Ms. Bricker was entitled to $22,330.86 in reimbursement from Mr. Hall for the previous payments she made on the HELOC debt after Mr. Hall stopped making them.  (Divorce Decree at 5, 26.)

{¶ 109} On appeal, Mr. Hall contends the trial court erred in allocating the entire HELOC debt to him as a separate debt.  He maintains the HELOC debt should have been equally split between the parties because it was secured during the course of the marriage and encumbered the marital home.

**1.  Legal Standards**

{¶ 110} A trial court must consider marital debt when dividing marital property.  Like assets, debts accumulated during the marriage are generally presumed to be marital unless it can be proved they are separate.  *See, e.g.*, *Nichols-Ross v. Ross*, 12th Dist. No. CA2008-

03-090, 2009-Ohio-1723, ¶ 26, citing *Nemeth v. Nemeth*, 11th Dist. No. 2007-G-2791, 2008-Ohio-3263, ¶ 5; *Yousef v. Iskander*, 9th Dist. No. 29703, 2021-Ohio-3322, ¶ 6; *Kehoe v. Kehoe*, 8th Dist. No. 97357, 2012-Ohio-3357, ¶ 14, citing *Vergitz v. Vergitz*, 7th Dist. No. 05 JE 52, 2007-Ohio-1395, ¶ 12. Accordingly, when a debt is incurred during the marriage, the burden is on the party seeking to have the debt classified as separate debt to demonstrate by a preponderance of the evidence that the debt was the separate obligation of the other spouse. *See, e.g.*, *Grow v. Grow*, 12th Dist. No. CA2010-08-209, 2012-Ohio-1680, ¶ 18; *Brady v. Brady*, 11th Dist. No. 2007-P-0059, 2008-Ohio-1657, ¶ 38; *Kehoe* at ¶ 14; *Vergitz* at ¶ 12.

{¶ 111} "Marital debt has been defined as any debt incurred during the marriage for the joint benefit of the parties or for a valid marital purpose." *Sangeri*, 2020-Ohio-5520 at ¶ 48, citing *Ketchum v. Ketchum*, 7th Dist. No. 2001 CO 60, 2003-Ohio-2559, ¶ 47. *See also Gupta v. Gupta*, 8th Dist. No. 99005, 2013-Ohio-2203, ¶ 51. Although R.C. 3105.171 does not explicitly address the division of marital debt, it is nonetheless subject to allocation as part of the trial court's distribution of marital property. *See, e.g.*, *Sangeri* at ¶ 48; *Caleshu*, 2020-Ohio-4075 at ¶ 10. As such, allocation of marital debt is guided by the same equitable factors contained in R.C. 3105.171. *See Caleshu* at ¶ 10, quoting *Wood v. Wood*, 10th Dist. No. 10AP-513, 2011-Ohio-679, ¶ 15, citing *Byers v. Byers*, 4th Dist. No. 09CA3124, 2010-Ohio-4424, ¶ 18. *See also Smoyer*, 2019-Ohio-3461 at ¶ 51.

### 2. Analysis

{¶ 112} In this case, the HELOC debt was incurred during the marriage and in both parties' names. The trial court concluded, however, that Ms. Bricker had proven the entirety of the HELOC debt was separate and therefore Mr. Hall's sole responsibility.

{¶ 113} In support of that determination, the trial court found—among other things—that the HELOC debt was created "without [Ms. Bricker's] consultation." (Divorce Decree at 4. *See also* Divorce Decree at 5.) But this finding cannot be squared with the record.

{¶ 114} Ms. Bricker testified Mr. Hall asked her to cosign on the HELOC debt in April 2004. (Tr. Vol. IV at 607-09.) And she admitted to signing the paperwork necessary to obtain the HELOC, as evidenced by documents she presented at trial. (Tr. Vol. IV at 607-12, 729; Ex. BB1.) Ms. Bricker also acknowledged that, at the time she cosigned for the HELOC secured by the marital residence, she knew it would be used to finance Mr. Hall's Media Distributors business. (Tr. Vol. IV at 608-10, 614.) For these reasons, we find there

is no competent, credible evidence in the record to support the trial court's finding that Mr. Hall incurred the HELOC debt without Ms. Bricker's consultation.

{¶ 115} Because the HELOC debt was incurred during the marriage and both parties were legally responsible for it, it is presumed to be a marital debt. Nonetheless, the trial court deemed the HELOC to be Mr. Hall's separate debt without fully utilizing the definition of "marital debt" adopted by this court—and most, if not all, of our sister appellate district courts—in its analysis. *Sangeri* at ¶ 48. For instance, the trial court found the HELOC debt was not incurred for a marital purpose because Ms. Bricker testified it was secured "solely to aid" his business, which, by 2007, was providing meager contributions to the family's expenses. (Divorce Decree at 4-5, citing Ex. KK1. *See also* Tr. Vol. IV at 607-10.) But the trial court failed to consider whether, when the HELOC was obtained in 2004, it was "for the joint benefit of the parties." *Sangeri* at ¶ 48.

{¶ 116} On review of the record before us, we do not find competent, credible evidence in the record to support the trial court's finding that the HELOC was not a marital debt. Indeed, it is undisputed that Mr. Hall was the sole income earner for the family when the HELOC was secured in 2004. Mr. Hall testified that, to continue operations, he needed the line of credit to help finance and grow his business. (Tr. Vol. II at 287; Tr. Vol. III at 464-67.) It is without question Ms. Bricker agreed to jointly incur the debt and knew at the time the HELOC was secured that it would be used for Mr. Hall's business. Evidence showed that after 2004, Mr. Hall's business continued to operate and generate income for several years. (*See* Ex. G2.) True, the parties' emails in May 2007 indicated that, at that time, Mr. Hall's contribution to familial expenses was meager. (Divorce Decree at 5, citing Ex. KK1.) But that fact has little bearing on the issue of whether the HELOC was "for the joint benefit of the parties or for a valid marital purpose" at the time it was obtained. *E.g.*, *Sangeri* at ¶ 48. Indeed, Ms. Bricker agreed the assets of Media Distributors—if any had remained—would be marital, and if the defunct company had any value, she believed she would be entitled to half of it. (*See* Tr. Vol. IV at 765-66.)

{¶ 117} It is not clear if the trial court found the marital debt to be separate based on its erroneous financial misconduct finding. We also note that the trial court justified its decision to allocate the entire HELOC debt to Mr. Hall on *Dunham*, 2007-Ohio-1167 at ¶ 66. (*See* Divorce Decree at 5.) But that case involved the equitable division of tax liability

debt that had already been determined to be ***marital*** debt—not a separate debt. (Divorce Decree at 5.) As such, the trial court's reliance on case law discussing the equity of unequally dividing a ***marital*** debt as justification for its decision to allocate the HELOC to Mr. Hall "as a separate debt" was misguided. (*See* Divorce Decree at 5.)

{¶ 118} An unequal division of the HELOC debt may be justified under R.C. 3105.171(C)(1) when considering the factors set forth in R.C. 3105.171(F). *See, e.g.*, *Caleshu* at ¶ 10. But the trial court did not analyze the division of the HELOC debt under this framework because it erroneously found it was not a marital debt.

{¶ 119} Accordingly, we sustain, in part, Mr. Hall's third assignment of error, reverse the trial court's findings as to the HELOC debt, and remand this matter to the trial court so it may modify its classification and allocation of the HELOC debt in a manner consistent with our decision and in accordance with R.C. 3105.171.

### C. Fourth Assignment of Error

{¶ 120} In his fourth assignment of error, Mr. Hall attributes error to the trial court's valuation and distribution of the non-transferrable Siggi's stock shares and stock options acquired, exercised, and/or sold by Ms. Bricker for a total net deposit of $477,745.95 into the money market account she opened in January 2018. (Divorce Decree at 11-14. *See also* Tr. Vol. IV at 639-40, 731-42.) These stock options were acquired pursuant to the incentive stock option agreement Ms. Bricker entered with her employer in February 2016. (*See* Ex. CC1; Tr. Vol. II at 253-65.) Pursuant to this agreement, Ms. Bricker was granted the option to purchase up to 55 shares of Siggi's stock, exercisable in installments between November 2016 and November 2019. (Tr. Vol. III at 559; Ex. CC1; Ex. 126. *See* Tr. Vol. II at 253-65; Tr. Vol. III at 558-63; Tr. Vol. IV at 632-38, 786-88.)

{¶ 121} In January 2017, Ms. Bricker exercised 14 shares at $1,311 per share—the exercise price set forth in the February 2018 incentive stock option agreement—totaling $18,354. (Divorce Decree at 11. *See also* Tr. Vol. II at 253-65; Tr. Vol. IV at 630, 633, 638-40, 645-51, 788; Ex. CC1; Ex. 72A; Ex. 72B; Ex. 126.) Thus, on October 9, 2017, the de facto termination date of the parties' marriage, it is undisputed that Ms. Bricker owned 14 shares of Siggi's stock and had 41 stock options that were not yet exercisable. (*See* Ex. CC. *See also* Tr. Vol. I at 190-92; Tr. Vol. IV at 634-41, 647; Ex. CC1.)

{¶ 122} In February 2018, Ms. Bricker sold her 14 shares for a net deposit of $177,089.20. (Divorce Decree at 11. *See also* Ex. CC; Ex. 69; Tr. Vol. II at 253-65; Tr. Vol. IV at 640-41. *But see* Tr. Vol. IV at 633-34, 641, 736 (Ms. Bricker testifying the amount deposited for the sale of her 14 Siggi's shares was $168,473.63).) No taxes were withheld from these deposits; instead, they were taxed at the lower long-term capital gains rate in 2018. (Divorce Decree at 11. *See* Ex. CC; Ex. C3; Tr. Vol. IV at 626-34.)

{¶ 123} The February 2018 sale of Siggi's to another company also triggered the forced exercise and sale of Ms. Bricker's remaining 41 options—14 of which had become exercisable in November 2017 but were not purchased prior to the company's sale (*see* Ex. CC1; Tr. Vol. IV at 634-37, 782)—resulting in a deposit of $300,656.75 into Ms. Bricker's bank account. (Divorce Decree at 11. *See also* Tr. Vol. II at 260; Tr. Vol. IV at 643-44; Ex. CC; Ex. CC1; Ex. CC3; Ex. 72B.)

{¶ 124} As a result of these capital gains, Ms. Bricker's reported income in 2018 was much higher than it was in both the prior and subsequent years, and she was required to pay $119,516 in state and federal taxes for all income—i.e., capital gains and wages—she earned that year. (*Compare* Ex. 63, *with* Ex. 61; Ex. 62; Ex. 64. *See also* Ex. 72B; Ex. CC; Ex. C3; Tr. Vol. III at 547, 562-63; Tr. Vol. IV at 626-34.)

{¶ 125} It was undisputed the 14 Siggi's stock shares and 41 stock options were sold after October 9, 2017, the de facto termination date of the marriage. (*See* Ex. CC2; Tr. Vol. IV at 638-44.) And Ms. Bricker conceded the 14 exercised shares were marital property. (Tr. Vol. IV at 631, 635, 640-41, 650-51.) But she posited that Mr. Hall was only entitled to one-half of the value of the $18,354 in marital funds used to purchase the 14 Siggi's shares at the exercise price of $1,311 per share. (*See* Tr. Vol. IV at 640-42, 651, 721-22, 732-33.) Ms. Bricker also contended that the other 41 stock options should be awarded to her, free and clear of any claim by Mr. Hall, because they were not exercisable until after the de facto termination date. (Def.'s Closing Brief at 8; Tr. Vol. IV at 635-38, 644, 651-52.) Mr. Hall maintained, however, that all of the Siggi's stock shares and stock options were marital property and argued he was entitled to one-half of the total net proceeds from the February

2018 sale of all 55 stock shares and stock options.[6]  (*See* Oct. 7, 2022 Pl.'s Closing Brief at 10-13.  *See also* Tr. Vol. III at 546-55, 562-63.)

{¶ 126} The trial court agreed with Mr. Hall that the 14 shares of stock and the 41 stock options were marital property subject to allocation and division between the parties.  (Divorce Decree at 12.)  But the trial court valued all 55 shares—without distinction—at the exercise price of $1,311 per share, as stated in the February 2016 stock option agreement, for a total marital value of $72,105.  (Divorce Decree at 12-14; Ex CC1.)  As such, the trial court found Mr. Hall was entitled to one-half of the marital value of Ms. Bricker's Siggi's stock shares and stock options, and awarded Mr. Hall $36,052.50.  (Divorce Decree at 28.)

{¶ 127} On appeal, Mr. Hall argues such valuation was not supported by competent, credible evidence.  (Brief of Appellant at 50-59.)

### 1.  Legal Standards

{¶ 128} " 'Although a trial court enjoys broad discretion in determining the value of a marital asset, such discretion is not without limit.' "  *Fernando*, 2020-Ohio-7008 at ¶ 53, quoting *Apps*, 2003-Ohio-7154 at ¶ 38, citing *James*, 101 Ohio App.3d at 681.  Our duty is " 'not to require the adoption of any particular method of valuation, but to determine whether, based upon all the relevant facts and circumstances, the court abused its discretion in arriving at a value.' "  *Id.*  Nonetheless, " '[a] trial court must have a rational evidentiary basis for assigning value to marital property.' "  *Fernando* at ¶ 53, quoting *Apps* at ¶ 38, citing *McCoy v. McCoy*, 91 Ohio App.3d 570, 576-78 (8th Dist.1993).

{¶ 129} While a trial court is neither required to use a particular method nor precluded from using any method when valuing a marital asset, a valuation of assets should generally be based on the present value of the asset.  *Janosek v. Janosek*, 8th Dist. No. 86771, 2007-Ohio-68, ¶ 53, citing *Berish*, 69 Ohio St.2d 318, and *Herron v. Herron*, 3d Dist. No. 1-04-23, 2004-Ohio-5765 (when determining the value of a corporation for the purpose of a property division in a divorce, the trial court must determine the corporation's fair market value).

{¶ 130} And, generally, while a trial court should consistently apply the same set of dates when valuing marital property, circumstances of some cases may require the use of

---

[6] As the trial court noted, Mr. Hall actually argued for a split between the total deposits made to Ms. Bricker's accounts for the stock options—i.e., $477,790.95—but that figure did not reflect the fees paid for the wire transfers, which the trial court found reduced the total net deposits to $477,745.95. (Divorce Decree at 11.)

different dates for valuation purposes. *See, e.g., Karabogias v. Zoltanski*, 8th Dist. No. 111062, 2023-Ohio-227, ¶ 13. Furthermore, "[t]he choice of a date as of which assets available for equitable distribution should be identified and valued must be dictated largely by pragmatic considerations." *Berish* at 319. Thus, a "trial court has discretion to determine the date of valuation, and this date may vary from asset to asset." *Wei v. Jie Shen*, 12th Dist. No. CA2002-12-300, 2003-Ohio-6253, ¶ 21, citing *Berish* at 319. *See also O'Brien v. O'Brien*, 10th Dist. No. 98AP-1162, 1999 Ohio App. LEXIS 2558, *7-8 (June 3, 1999).

{¶ 131} The selection of a valuation date other than the actual date of divorce is within the discretion of the trial court. *O'Brien* at *7, citing *Rogers v. Rogers*, 10th Dist. No. 96APF10-1333, 1997 Ohio App. LEXIS 4033 (Sept. 2, 1997). The trial court, however, "must adequately explain its reasons for choosing a different valuation date for certain marital assets." *Coble v. Gilanyi*, 11th Dist. No. 97-T-0196, 1999 Ohio App. LEXIS 6267, *9 (Dec. 23, 1999). *See also Meeks v. Meeks*, 10th Dist. No. 05AP-315, 2006-Ohio-642, ¶ 15.

### 2. Analysis

{¶ 132} The trial court found the Siggi's stock shares and Siggi's stock options Ms. Bricker received as compensation from her employment during the parties' marriage were marital property subject to division and allocation between the parties. (Divorce Decree at 12, 14.) It further found Mr. Hall was entitled to one-half of the marital value of all Siggi's stock shares and stock options. (Divorce Decree at 28.) Neither of these findings is challenged on appeal. Instead, the issue before us is whether the trial court erred in valuing these marital assets using the February 2016 exercise price in the stock options plan.

{¶ 133} On October 9, 2017—the de facto termination date of the parties' marriage—Ms. Bricker owned 14 shares of Siggi's stock, had a vested but unexercised option to purchase 14 additional shares of stock, and held unvested options to purchase 27 additional shares of stock in the future. (*See* Ex. CC1; Ex. CC.) Neither party presented evidence at trial valuing these marital assets on the de facto termination date.

{¶ 134} By February 2018, Ms. Bricker's 14 stock shares and 41 stock options had been sold. (*See* Ex. CC; Tr. Vol. IV at 626-52; 731-41.) The trial court found the net payment Ms. Bricker received in connection therewith to be $477,745.95. (Divorce Decree at 11.) The trial court's calculation did not factor in the amount Ms. Bricker paid in taxes in

connection with her 2018 capital gains from the sale of her Siggi's stock shares and stock options. (Divorce Decree at 11-14. *See also* Ex. C3; Tr. Vol. III at 562-63; Tr. Vol. IV at 626-34.)

**{¶ 135}** A stock option is a form of discount coupon in that it allows the owner to buy a share of stock for a predetermined price. *See Batra v. Batra*, 135 Idaho 388, 394 (2001). "The higher the market price of the stock, the greater the discount between the option price and share price." *Id.*

**{¶ 136}** Initially, we note that stock options are usually valued by determining the worth of the underlying stock on the day of the trial. *Banning v. Banning*, 2d Dist. No. 95 CA 79, 1996 Ohio App. LEXIS 2693, *16-19 (June 28, 1996). And, often, valuing and allocating nontransferable stock options are both difficult endeavors. *E.g.*, *Flores v. Flores*, 12th Dist. No. CA2021-01-009, 2021-Ohio-3965, ¶ 9-11. "When valuing stock options, both the stock value and the grant price for each stock option must be considered, along with other complicating factors." *Flores* at ¶ 10, quoting 1 Anderson, *Ohio Domestic Relations Practice Manual*, Section 4.14 (2020).

**{¶ 137}** A stock option generally does not have a readily ascertainable value at the time of its grant. *Flores* at ¶ 11, quoting *Murray v. Murray*, 128 Ohio App.3d 662, 674 (12th Dist.1999). *See generally Fisher v. Fisher*, 564 Pa. 586 (2001) (describing different methods of valuing marital stock options earned as a form of deferred compensation). Instead, a stock option "has value based upon how likely the market price will rise above the exercise price in the time before the stock option expires." *Flores* at ¶ 11, citing *Banning* at *20. Thus, the " '***true value of stock options lies in their future exercise***.' " (Emphasis added.) *Id.*, quoting *Murray* at 674. In other words, "the true value of the stock option to its owner is the potentia[l] for appreciation in stock price without investment risk. If the stock price were to drop, the owner simply would not exercise the option since he could instead buy the stock more cheaply on the market." (Internal quotation marks omitted.) *Id. See also Batra* at 394, citing *Balderson v. Balderson*, 127 Idaho 48, 53 (1995) ("Given the nature of stock options, a lump sum payment for yet to be vested stock options at the date of divorce would not reflect the value and risk inherent in stock options.")

**{¶ 138}** Although a present division of assets is generally preferable, if present valuation is uncertain or impractical—as it often will be with unvested stock options and

pension benefits—the better practice is to order that any future recovery or payment be divided, if and when received, according to a formula fixed in the property assignment. *See, e.g.*, *Wilson v. Wilson*, 116 Ohio St.3d 268, 2007-Ohio-6056, ¶ 5-20; *Younkin v. Younkin*, 10th Dist. No. 98AP-419, 1998 Ohio App. LEXIS 6258, *7-9 (Dec. 22, 1998). *See also In re Valence*, 147 N.H. 663, 675 (2002) (Dalianis, J., dissenting) (describing the "if and when received" method for valuing and distributing stock options upon divorce as requiring a court to "determine[] the percentage of the proceeds from the stock options (stock or cash received from the sale of the stock) due [to] the spouse if and when the options vest and are exercised"). (Citations omitted.)

{¶ 139} In this case, the 14 Siggi's stock shares and 41 Siggi's stock options were all sold 4 months after the de facto termination date of the parties' marriage and approximately 4 years before trial in this case. Although objective evidence and actual events established the true value of the Siggi's stock shares and stock options just a few months after the October 9, 2017 de facto termination date of the parties' marriage, the trial court instead concluded it would be appropriate to value all stock shares and stock options using the exercise price contained in the stock options plan that granted these stock benefits to Ms. Bricker in February 2016.

{¶ 140} That decision was rooted in the trial court's determination that Ms. Bricker's work for the company in the approximately four months after the de facto termination date of the marriage "must be said to have contributed, by whatever amount, to the appreciation of the stock." (Divorce Decree at 14.) There is no evidence in the record before us, however, to support this finding. And we are not persuaded by the trial court's suggestion that the value of the stock shares and stock options when sold in February 2018 inherently relied on Ms. Bricker's speculative efforts in the four months following the de facto termination date "to increasing [the] value" of the company. (*See* Divorce Decree at 13-14.)

{¶ 141} To be sure, a news article published on October 12, 2017—just three days after the de facto marriage termination date—suggested Siggi's was working toward a possible sale of the company (Ex. 70), which was confirmed on January 4, 2018 (Ex. 71). Articles in the record before the trial court indicated that "Siggi's topline grew 50% in 2017" (Ex. 70; Ex. 71), and it stands to reason that such growth was recorded long before October 9, 2017. (*See* Ex. 70.) We further note Ms. Bricker's stock benefits were not based on her

performance for the company but, rather, given as an incentive for her future (e.g., continued) employment. (*See* Ex. CC1.) In other words, irrespective of the quality of her job performance, Ms. Bricker's stock benefits would have been earned each year her employment continued. (*See* Tr. Vol. IV at 737-38.)

{¶ 142} As such, we find no competent, credible evidence in the record before us to support the trial court's finding that Ms. Bricker's efforts in the few months after October 9, 2017 appreciably contributed to Siggi's high valuation.

{¶ 143} Relying on that erroneous finding, however, the trial court found that "[i]n the absence of a more definitive figure," it would be "inappropriate and inequitable" to value these marital assets at their sale price because all sales took place after the de facto termination date of the marriage. (*See* Divorce Decree at 14.) But the unsold status of the stock benefit Ms. Bricker earned during the marriage did not otherwise deprive the asset of its character as marital property. And the marital character of the assets remained even though the true value of the 14 stock shares and 41 stock options Ms. Bricker held on the de facto termination date was not realized until 4 months thereafter when they were sold.

{¶ 144} Based on the foregoing, we find the trial court abused its discretion in using the February 2016 exercise price to value the Siggi's stock shares and stock options. The Supreme Court has consistently held that "flat rules as to property division and the valuation of marital assets simply cannot be established in domestic relations proceedings because equity depends on a thorough consideration of the totality of the circumstances." (Citations omitted.) *Rehfeldt v. Rehfeldt*, 1st Dist. No. C-850056, 1986 Ohio App. LEXIS 5603, *13 (Feb. 12, 1986). *See, e.g.*, *Briganti v. Briganti*, 9 Ohio St.3d 220, 221-22 (1984). Given the fact that evidence of the actual sale price for the Siggi's marital stock shares and stock options ***was*** introduced at trial, we find it unfair and inequitable for the trial court to use the February 2016 exercise price without adequate reasoning supporting its decision to do so. By permitting Ms. Bricker to retain the appreciated value of marital assets as her separate property, the trial court provided a windfall to her despite finding the Siggi's stock shares and stock options were marital property to be divided equally between the spouses.

{¶ 145} Accordingly, we sustain, in part, Mr. Hall's fourth assignment of error, and remand this matter to the trial court for it to determine an accurate valuation of the Siggi's stock shares and stock options. On remand, the trial court's valuation of the 14 Siggi's stock

shares and 41 stock options held on the de facto termination date of the parties' marriage must take into account either the appreciation in value as of October 9, 2017 or the actual value when sold in February 2018. In the absence of testimony valuing the Siggi's stock shares and stock options on October 9, 2017, we find the evidence of the proceeds from the February 2018 sale of all stock shares and stock options provides the most accurate fair market value.

{¶ 146} On that point, we note the amount subject to division between the parties would undoubtedly be less than the net deposit amount of $477,745.95 found by the trial court. (Divorce Decree at 11.) This is because Ms. Bricker paid considerable income taxes in connection with her 2018 earnings, which included the significant proceeds from the sale of her Siggi's stock shares and stock options. (*See* Ex. C3.) Neither party produced evidence at trial as to what they believed that amount should be, and the trial court did not make any finding as to the net value of the proceeds from the sold stock and stock options when the taxes Ms. Bricker paid in connection therewith are factored in. (*Compare* Ex. C3; Tr. Vol. III at 562-63; Tr. Vol. IV at 626-34, 741.) Thus, on remand, the trial court may determine it is not possible or equitable to calculate the marital value without receiving additional evidence at a hearing on this issue.[7]

---

[7] We also note that further analysis of Ms. Bricker's actions regarding the stock proceeds may be necessary on remand. In January 2018, Ms. Bricker opened a new money market account when she was notified that Siggi's had sold. (Tr. Vol. IV at 639-40, 731-42.) The proceeds from the sale of her 14 stock shares and 41 stock options were deposited into this account in February 2018. (*See* Tr. Vol. IV at 639-41, 733-42; Ex. CC2.) On September 11, 2018, the trial court entered a standard mutual temporary restraining order prohibiting the parties from, among other things, "[w]ithdrawing, transferring ownership of, spending, encumbering[,] or disposing of any funds deposited in any financial institution, including but not limited to, bank accounts, savings accounts, **money market**, credit unions, brokerage accounts, pension plans, stocks, bonds, or certificates of deposit" of "assets that either or both parties may have a claim."(Emphasis added.) (Sept. 11, 2018 Standard Mutual Temporary Restraining Order at ¶ 4.) While Ms. Bricker did not believe the 41 stock options were marital property, she admitted the 14 stock shares she purchased with marital funds were. It is without question, then, the restraining order applied to her money market account.

At trial, evidence showed that *after the restraining order was put in place*, Ms. Bricker used a considerable amount of funds from the money market account to pay for additional expenses outside of her regular monthly expenses and moved funds from the money market account to her personal checking account. (*See, e.g.*, Tr. Vol. II at 204-12, 224-43; Tr. Vol. III at 490-92, 515-20, 572-75; Tr. Vol. IV at 731-42; Ex. 65A; Ex. 129. *See also* Ex. 2.) By the time of trial, Ms. Bricker testified there was about $40,000 left in her money market account. (Tr. Vol. IV at 781.) Excluding her 2018 income tax payment of $119,516—which was made using funds in the money market account (Tr. Vol. IV at 740-41)—Ms. Bricker has thus spent or transferred out $318,229.95 of the $477,745.95 in net proceeds (assuming the trial court's calculation of the total proceeds to be correct). Ms. Bricker claimed she "had no idea" that the money market account "was under the auspices" of the September 11, 2018 restraining order. (Tr. Vol. IV at 733-34.) In any event, we note that some of these payments may pertain to marital assets (e.g., property taxes on the marital residence and the amount owed

## V. CONCLUSION

{¶ 147} Having sustained Mr. Hall's first assignment of error and his second, third, and fourth assignments of error, in part, we reverse the January 30, 2023 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, and remand this matter to the trial court for further proceedings consistent with this decision.

*Judgment reversed*; *cause remanded.*

BEATTY BLUNT and BOGGS, JJ., concur.

———————————

for Ms. Bricker's 2018 income in connection with the sale of the Siggi's stock shares and stock options) while others do not (e.g., Ms. Bricker's new car, personal credit cards, and her mother's retirement home). (*See* Ex. 129; Tr. Vol. IV at 740-42.)

Although Mr. Hall suggested during trial that Ms. Bricker had violated the restraining order and noted as early as January 28, 2019 that there would be "issues regarding [Ms. Bricker's] usage or dissipation of marital assets" (Emphasis deleted.) (Jan. 28, 2019 Pl.'s Pretrial Statement at 3), he did not file a motion for contempt prior to trial and the trial court made no findings thereon when it issued the divorce decree. But because we now find the trial court erred in using the exercise price to value the Siggi's stock shares and stock options, it may be appropriate on remand for the trial court to also classify Ms. Bricker's expenditures from the money market account as marital or personal, and evaluate the propriety of her use of the money market funds after the restraining order was entered on September 11, 2018.